Gerald J. D'AREZZO

v.

Margaret A. BOWDEN et al.

No. 84–471–Appeal.

Supreme Court of Rhode Island.

July 14, 1986.

---

Daniel A. Procaccini, Providence, for plaintiff.

Paul V. Curcio, Hinckley Allen Tobin & Silverstein, Mark C. Hadden, Gildey, Lovegreen & Sarli, Providence, for defendants.

## OPINION

KELLEHER, Justice.

In this Superior Court negligence action, the plaintiff is before us on appeal from the grant by the trial justice of the defendants' motion for a directed verdict and the grant of the defendants' conditional motion for a new trial. The trial justice took these actions while acting pursuant to Rule 50(b) and (c) of the Superior Court Rules of Civil Procedure. He had reserved decision on the directed-verdict motion at the conclusion of the presentation of all the evidence and submitted the dispute to a jury. The jury subsequently awarded the plaintiff damages in the amount of $275,000 and then reduced that amount to $110,000 after it had assigned 60 percent of the fault for the mishap to the plaintiff. Hereafter we shall refer to the plaintiff, Gerald D'Arezzo, and the defendant, Margaret Bowden, by their last names. No necessity exists for us to refer specifically to the other named defendant, Bowden's husband, because his fate is dependent upon the resolution of D'Arezzo's claim against Bowden's wife.

The incident precipitating this litigation occurred on December 15, 1979. At that time D'Arezzo worked as an auto-body technician. Early in the afternoon of the day in question he paid a visit to the premises of a used-car dealer and, in the spirit of the Christmas season, enjoyed a couple of beers with his host. Later that day he returned to his home, which was situated on Douglas Pike in North Providence.

D'Arezzo's companion on this occasion was his girl friend, Donna. While Donna prepared dinner, D'Arezzo enjoyed his favorite libation, Vodka and grapefruit juice. As the afternoon wore on, he enjoyed additional servings of his favorite drink. He couldn't remember the number of drinks he consumed while at the house, but he did acknowledge consumption of at least two. He was equally indefinite about the exact amount of beer he had consumed while exchanging Christmas greetings with the used-car dealer.

Once dinner was over, D'Arezzo drove to Providence where he visited with his father. No libations were served by the father. D'Arezzo left his father's home and drove to Lincoln Greyhound Park, and at approximately 7:30 p.m. he parked his 1973 Ford Galaxy in the park's grandstand area. He purchased a program and returned to the grandstand's bar, where he once again enjoyed his favorite drink. He placed bets on the first three dog races. Again, he could not recall the exact number of drinks he consumed during his wagering activities.

Feeling a "little light headed," D'Arezzo returned to his car because he had promised Donna a trip to the LaSalette Shrine, where he and she could view the shrine's Christmas display. When he arrived at his vehicle, D'Arezzo noted that one of his tires was flat. His plight worsened when he discovered that the spare was also flat.

At this point D'Arezzo decided he would walk home. He walked out of the lot and proceeded westward along Twin River Road. Photographs introduced at trial indicate that Twin River Road is a two-lane highway with a double white line running down its middle separating westbound traffic from eastbound traffic. Along each side of the road is another white line, which delineates an area referred to by the witnesses as the breakdown lane. Each lane appears to be approximately four feet eight inches in width. Twin River Road might be described as a connector highway because

it begins on the east at Route 146 and terminates at the west at Douglas Pike. D'Arezzo described the weather conditions as he embarked on his hitchhiking expedition as clear and cold. He had no overcoat but was wearing a three-piece suit. D'Arezzo told the jury that he began hitchhiking at approximately 8:30 p.m.

In direct examination D'Arezzo stated that when hitchhiking he was within the breakdown area or standing on the white line separating the breakdown lane from the westbound-traffic lane. According to him, the only portion of his anatomy that was out in the traffic lane was his thumb. He described the roadway as dark, and he could not recall whether there were street lights in the vicinity. He said that one car stopped but then drove off as he waited at the left-front fender for the driver to ask what D'Arezzo's problem was. The last memory D'Arezzo had of his hitchhiking experience was turning around at the sound of a car approaching and seeing its headlights. When D'Arezzo regained consciousness, he was at Pawtucket Memorial Hospital where he subsequently underwent surgery for several severe injuries, including compound fractures of each leg, a ruptured spleen, and a severed ear.

In cross-examination, however, D'Arezzo admitted that in a pretrial deposition he had conceded that he actually did not know whether he was in or out of the breakdown-lane area while making his way along Twin River Road.

In her testimony Bowden testified she had been traveling westward on Twin River Road, returning to her North Providence residence after an evening of shopping with her husband and teenaged daughter in Cumberland at the Ann and Hope complex. She entered Twin River Road at approximately 9 p.m. She was quite familiar with the area and was driving ten to fifteen miles per hour below the posted speed limit of forty-five miles per hour. She had reduced her speed because she was aware of the nearby dog track and the heavily wooded area abutting the highway. Bowden insisted she was traveling in the center of the westbound lane. Her headlight beams were on low beam because she did not wish to distract the drivers proceeding in the eastbound lane. She saw nothing by means of the lights from either the eastbound cars or her own headlights that would have alerted her to the presence of D'Arezzo.

After a vehicle had passed her in the eastward travel lane, she glimpsed something that seemed to appear suddenly at the right-front fender; almost instantaneously the right portion of the windshield collapsed into a network of cracks. Immediately after impact Bowden drove over to the side of the road and stopped the vehicle. Her husband took a flashlight from the glove compartment and ran back toward the point of impact. As she was about to leave the vehicle, her husband yelled, "It's a man. Get help." Bowden ran to a nearby house, and within minutes the police and a rescue squad arrived. Bowden's husband told the jury that after impact, he observed D'Arezzo lying perpendicular to the road with the greater part of his body in the breakdown lane and the lower portion of his body in the roadway.

A licensed practical nurse who was traveling eastward when she came upon the mishap stopped and rendered first aid to the victim. As she crossed the road, the nurse observed a pair of shoes close to the middle of the westbound travel lane. The nurse also testified that D'Arezzo was "reeking" of alcohol.

A detective who had extensive experience in the handling of highway mishaps expressed his opinion that at the time of the collision the Bowden vehicle was very close to the center of the lane. His opinion was based on his prior experience with highway mishaps, the location of D'Arezzo's shoes, and the damage to Bowden's vehicle.

At Pawtucket Memorial Hospital, blood tests were performed on D'Arezzo prior to his undergoing surgery. The tests indicated that his blood-alcohol level was .254

percent. The surgeon explained that this was a "high level of intoxication." The test was performed between 10 and 10:20 p.m.

The physician in charge of the state's Division of Substance Abuse for over twenty years expressed the belief that D'Arezzo at the time of the collision had to have had a blood-alcohol content of .30 percent. This witness explained to the jury that with a .30–percent reading not only would D'Arezzo have lost coordination of both small and large muscles, but his vision, judgment, and memory would also have been impaired. The witness also told the jury that any individual having a blood-alcohol level of .30 percent would be unable to maintain proper balance whether he or she was standing or walking.

A motorist who was traveling westward on Twin River Road at approximately 8:30 p.m. on the night of the mishap, while following an automobile being driven by a friend, described the road conditions as dry and dark. He said that after he passed the dog track, he saw his friend's vehicle swerve sharply to the left into the eastbound-traffic lane. Shortly thereafter, he testified, someone jumped in front of his car, causing him to execute the same maneuver as his friend. This witness testified that the jumper had come from the right-hand side of the road with his arm up in the air. He also testified that the jumper was wearing a suit.

Another witness who testified was the spouse of Lincoln's police chief. She was driving westward on Twin River Road at approximately 9 p.m. on the night in question. She said she saw a shadow on the side of the road and thought it was an animal. When she slowed down, a man came from the roadside onto the road as if he was thumbing a ride. He walked right in front of her car. She said she stopped, and the pedestrian just stood there for a brief period, gazing into the car "kind of dazed" and then moved back out of the way. She described the pedestrian as wearing a gray tweed suit. The witness also explained that observation at this stretch of the roadway was difficult because of the transition, as one traveled, from a very bright area near the track's exit to the darkened area where the incident occurred. She emphasized that there were no street lights in this area. The witness returned home and told her husband that he should alert his department that there was a man in the roadway who was trying to commit suicide or was "drunk."

In fact, the Lincoln police did receive several calls about a "subject" who was wandering around Twin River Road in the area of the race track. One officer who had received a radio message concerning the wandering man also received a second message indicating that that individual had been struck by an automobile.

Although D'Arezzo's appeal is two faceted in that it challenges the grant of the motion for a directed verdict and motion for a new trial, the critical and decisive issue in this controversy is whether the trial justice erred when he granted Bowden's motion for a directed verdict.

In reviewing the trial justice's decision on a motion for a directed verdict, this court is required, as is the trial justice, to examine all of the evidence in the light most favorable to the party objecting to the motion without giving any consideration to the weight of the evidence or the credibility of the witnesses and to draw from that evidence only those reasonable inferences that support the objecting party's position. If such an examination reveals evidence upon which reasonable minds could differ, then the motion should be denied and the jury should be left to determine the facts of the case. *Gordon v. St. Joseph's Hospital*, 496 A.2d 132 (R.I.1985). Adherence to these principles requires a trial justice and this court to leave to the factfinder's or factfinders' assessment a great variety of what might be considered dubious factual claims. However, no recovery can be predicated on positive evidence that contains inherent improbabilities or contradictions

that alone or in connection with other circumstances in evidence destroy the declarant's credibility. *Capezza v. Hertz Equipment Rental Corp.*, 118 R.I. 1, 371 A.2d 269 (1977); *Economou v. Valley Gas Co.*, 112 R.I. 514, 312 A.2d 581 (1973); *Gaudette v. Carter*, 100 R.I. 259, 214 A.2d 197 (1965); *Faubert v. Shartenberg's, Inc.*, 59 R.I. 278, 195 A. 218 (1937).

In granting Bowden's motion for a directed verdict, the trial justice classified D'Arezzo's testimony that he was struck while standing in the breakdown area as "inherently improbable" (1) because of D'Arezzo's out-of-court admission that he did not know where he was standing when he first had contact with the top portion of Bowden's right-front fender and (2) because all the other evidence presented at trial indicated that D'Arezzo was a super-saturated, meandering pedestrian who posed a hazard to the peace of mind and physical welfare of any and all motorists proceeding westward along Twin River Road on the evening in question.

Before us, counsel argued at great length that there was in the record evidence to support his client's claim that the impact occurred within the westbound breakdown area. In taking this position, counsel points to the crushing injuries sustained by D'Arezzo, his location after impact, a dispute about the actual location of D'Arezzo's shoes after impact, and the presence of a skid mark in the breakdown lane close to where D'Arezzo was found.

One of the pictures taken at the collision scene by the Lincoln police does show a skid mark in the breakdown-lane area. The picture also shows the debris left by the rescue squad as it rendered first aid to D'Arezzo. However, the picture lacks any probative value because of an absence of evidence indicating that the skid mark did in fact come from the Bowden vehicle. A police officer who was testifying about what was depicted within the picture told the trial justice that he (the officer) was unable either to say whether the skid mark was fresh or to give the source of the skid mark. A suggestion was made during his examination that the skid mark had been left by the rescue-squad vehicle.

D'Arezzo's dispute about the location of his shoes finds no support in the record. Both the police photographer and the officer who had received calls at headquarters relative to the mysterious, meandering pedestrian told the jury that D'Arezzo's shoes were in the middle of the westbound travel lane. The officer who had been taking the reports had left headquarters once he learned of the collision between D'Arezzo and Bowden's vehicle.

Again, D'Arezzo's location after the impact and the property damage sustained by the Bowden vehicle give ample support to Bowden's version of what happened. Evidence about plaintiff's injuries does not furnish an evidentiary basis in regard to where Bowden was at the time of the impact. The physical evidence and the testimony of three police officers, combined with that of Bowden, justify the trial justice in concluding that no reasonable person could find that D'Arezzo was struck while he was standing behind the breakdown line. In fact, the only reasonable conclusion to be drawn from this record is that D'Arezzo was struck when well into the travel lane.

The trial justice, when faced with the jury's verdict, concluded that the only possible explanation for the jury's finding of negligence was a belief by the jury that D'Arezzo had been in the travel lane for a length of time sufficient to charge Bowden with the opportunity to avoid the impact. However, as the trial justice noted, there was no evidence in the record that would support such a theory. Such theory is pure speculation rather than a reasonable inference.

The only possible evidence suggesting that plaintiff was in the travel lane came from the police chief's wife, who said she saw a shadow along the side of the road. However, she was not aware of what the shadow represented until she saw the pedestrian come out onto the road. More-

over, another witness—the one who was following his friend—did not see the pedestrian until he jumped in front of the car. Since D'Arezzo has consistently maintained that he was within the breakdown lane at all times during the mishap, we cannot fault the trial justice for rejecting this alternate theory of recovery.

Counsel for D'Arezzo also faults the trial justice for ignoring three other theories upon which he claims his client sought recovery. They are (1) failure to maintain a proper outlook; (2) failure to operate a vehicle in a reasonable and prudent manner, in consideration of the then-existing circumstances on Twin River Road; and (3) driving at such a speed as to "outrun" her headlights. The outrunning-of-the-head-lights theory is dismissed simply because the record is devoid of any evidence that would support such a theory. The other two defenses were merged and rejected when the trial justice found that "there was no evidence in this case upon which the jury could conclude that the defendant was negligent."

After examining the record in this case, we have nothing more to offer except to say that we endorse the actions of the trial justice. The plaintiff's insistence that the only part of his anatomy protruding into the travel portion of Twin River Road was his thumb is without question on this record "inherently incredible."

The plaintiff's appeal is denied and dismissed, and the judgment appealed from is affirmed.

BEVILACQUA, C.J., participated in the oral argument and in the decision of the court but retired prior to the publication of this opinion.