## CRAIG E. EDWARDS, EXECUTOR (ESTATE OF AGATHA M. EDWARDS) *v.* DANIEL TARDIF ET AL.
### (15554)

Borden, Berdon, Norcott, Katz and McDonald, Js.

Argued January 14—officially released April 29, 1997

*Andrew J. O'Keefe*, with whom was *Kathryn M. Cunningham*, for the appellants (defendant Jeffrey Ettinger et al.).

*Kathryn Calibey*, with whom were *David W. Cooney* and *Paul M. Iannaccone*, for the appellee (plaintiff).

*Opinion*

BERDON, J. The plaintiff, Craig E. Edwards, as executor of the estate of Agatha M. Edwards, brought this medical malpractice action for damages resulting from the suicide of Agatha M. Edwards (Edwards) against the defendant physicians Daniel Tardif, Jeffrey Ettinger, and the defendant Tardif and Ettinger, P.C. (professional corporation). The jury rendered a verdict in favor of the plaintiff against Ettinger and the professional

corporation in the amount of $504,750.07,[1] and in favor of Tardif. Ettinger and the professional corporation subsequently moved to set aside the verdict and for judgment notwithstanding the verdict, both of which were denied by the trial court.[2] Thereafter, Ettinger and the professional corporation[3] filed this appeal.[4] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. From 1981 to December, 1987, Edwards was treated by Tardif, an internist, for recurring clinical depression. Tardif's initial diagnosis in 1983 was mild depression, for which antidepressant medication was prescribed. In the years following the sudden death of Edwards' husband in 1985, her depression continued and intensified. In June, 1987, she was admitted to Manchester Memorial Hospital due to severe depression and alcohol abuse. While admitted in the hospital, Edwards expressed thoughts of suicide. The discharge diagnosis for Edwards revealed major affective disorder with depression and episodic alcohol abuse disorder.

During the June, 1987 admission, Tardif served as a consultant with respect to Edwards' illness and, subsequently, continued with her treatment. From the time of Edwards' discharge through December, 1987, Tardif's treatment included prescribing the antidepressant medication Tofranil.[5] On December 29, 1987, Tardif con-

---

[1] The jury, through interrogatories, found economic damages in the amount of $4750.07, and noneconomic damages in the amount of $500,000.

[2] Prior to the verdict, the defendants also moved for a directed verdict raising the same legal issues.

[3] For purposes of this appeal, Ettinger and the professional corporation do not distinguish their liability. Accordingly, we will refer to them jointly as the defendants.

[4] The plaintiff did not appeal from the verdict in favor of Tardif. The remaining defendants filed this appeal in the Appellate Court, which we transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[5] Tofranil is a brand name for the tricyclic antidepressant imipramine.

cluded that Edwards' depression had resolved and, therefore, discontinued the Tofranil medication. Tardif instructed Edwards to contact his office immediately upon the recurrence of depression. During the following ten months, however, there was no contact between Edwards and Tardif's office.

On October 5, 1988, Edwards telephoned Tardif's office complaining of depression. Ettinger, an internist who practiced with Tardif, was covering for Tardif on that date and returned Edwards' telephone call without first reviewing her medical chart. Ettinger had no prior knowledge of Edwards, had never treated her, and had never discussed her condition with Tardif. During the telephone conversation, Edwards informed Ettinger that she was depressed due to the approaching anniversary of her husband's death and because of difficulties at work. Ettinger did not inquire into the details of the events precipitating Edwards' depression, nor did he ascertain how many previous bouts of depression she had suffered. Rather than scheduling an appointment to evaluate Edwards, Ettinger determined as a result of the telephone conversation that she was depressed and prescribed 100 pills of Tofranil with two refills. Although Ettinger instructed her to contact Tardif in the next few weeks, no other follow-up measures were taken. Eight days later, on October 13, 1988, Edwards committed suicide by overdosing on the Tofranil pills prescribed by Ettinger. Edwards left behind a suicide note expressing her severe depression, torment and anguish.

At trial, the plaintiff presented the expert testimony of Douglas Berv, a psychiatrist and specialist in psychopharmacology. Berv stated that suicide is a known symptom and risk in individuals suffering from depression. He testified that Ettinger's treatment of Edwards fell below the accepted standard of care for internists in several respects. First, he testified that Ettinger pre-

scribed a large amount of Tofranil over the telephone to a patient he had never seen without first having Edwards come in for a psychiatric evaluation and suicide assessment. He further testified that Ettinger had also made an assumption with respect to Edwards' condition and what her treatment should be when the ten month lapse in treatment required a full evaluation of her mental and physical status. Additionally, Berv testified that instead of arranging a psychiatric evaluation for Edwards within a few days after her telephone call, Ettinger suggested that she should call again to schedule an office visit. Berv opined that, had Ettinger conformed to the applicable standard of care, Edwards' death would have been prevented.

The defendants argue that, as a matter of law, the trial court should have set aside the verdict and rendered judgment in their favor because Edwards' suicide was unforeseeable and constituted an independent intervening cause. In response, the plaintiff asserts that there was sufficient evidence upon which the jury reasonably could find that Edwards' suicidal death was a foreseeable result of the defendants' failure to conform to the accepted standard of care for physicians in their line of practice. We agree with the plaintiff.

We begin with the premise that a physician is required by law to exercise the degree of skill, care and diligence that is customarily demonstrated by physicians in the same line of practice. *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 300–302, 465 A.2d 294 (1983). A physician must exercise such reasonable skill and diligence in all aspects of providing care and treatment to a patient. *Allen* v. *Giuliano*, 144 Conn. 573, 575, 135 A.2d 904 (1957). To prove that a physician has breached the legally required standard of care, a plaintiff must offer some evidence that the conduct of the physician was negligent. *Snyder* v. *Pantaleo*, 143 Conn. 290, 294, 122 A.2d 21 (1956). Except in the unusual case in which

the want of care or skill is so gross that it presents an almost conclusive inference of want of care; *Puro* v. *Henry*, 188 Conn. 301, 305, 449 A.2d 176 (1982); the testimony of an expert witness is necessary to establish both the standard of proper professional skill or care on the part of a physician; *Shelnitz* v. *Greenberg*, 200 Conn. 58, 66, 509 A.2d 1023 (1986); "and that the defendant failed to conform to that standard of care." *Mather* v. *Griffin Hospital*, 207 Conn. 125, 131, 540 A.2d 666 (1988). Furthermore, the plaintiff must establish a causal relationship between the physician's negligent actions or failure to act and the resulting injury by showing that the action or omission constituted a substantial factor in producing the injury. Id., 130.

Our inquiry in this case focuses on whether Edwards' suicide was an act that broke the chain of causation. "As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm." *McLaughlin* v. *Sullivan*, 123 N.H. 335, 337, 461 A.2d 123 (1983); see also annot., 11 A.L.R.2d 751, 756 (1950) ("[w]here an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render [the] defendant civilly liable"). In other words, suicide generally is an unforeseeable result that serves to preclude civil liability. See, e.g., *Tate* v. *Canonica*, 180 Cal. App. 2d 898, 913–14, 5 Cal. Rptr. 28 (1960); *Eidson* v. *Reproductive Health Services*, 863 S.W.2d 621, 627 (Mo. App. 1993); *McLaughlin* v. *Sullivan*, supra, 337–38. This common law rule has been stated as follows: "[I]f one is sane, or if the suicide is during a lucid interval, when one is in full command of all faculties, but life has become

unendurable by reason of the injury, it is agreed in negligence cases that the voluntary choice of suicide is an abnormal thing, which supersedes the defendant's liability." W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 44, p. 311.

Conversely, suicide will not break the chain of causation if it was a foreseeable result of the defendant's tortious act. In *Wozniak* v. *Lipoff*, 242 Kan. 583, 584, 750 P.2d 971 (1988), for example, the plaintiffs brought a medical malpractice action against a physician for negligence in the treatment of their decedent. The decedent had suffered from Graves' disease, a hormonal disorder, and depression. Id., 584–85. During his treatment of the decedent, the defendant prescribed sixty pills of the antidepressant Sinequan with three refills, on which the decedent overdosed. Id., 586–87. After a jury verdict for the plaintiffs, the defendant appealed, claiming that the decedent's death resulted from an intervening act other than his negligence. Id., 599. The court recognized that the jury heard evidence that suicide is always a possibility in treating a depressed patient and that the appropriate standard of care in treating a depressed patient is to prescribe the lowest feasible amount of medication. Id. Accordingly, the court concluded, "there was competent evidence from which a rational factfinder could find [the defendant] should have reasonably foreseen the danger of [the decedent] committing suicide by an overdose of Sinequan." Id.

Several other courts have concluded that liability will be imposed on a physician when suicide was one of the foreseeable risks that made the physician's antecedent conduct negligent. See, e.g., *Meier* v. *Ross General Hospital*, 69 Cal. 2d 420, 427, 445 P.2d 519, 71 Cal. Rptr. 903 (1968) ("those charged with the care and treatment of a patient, who know of facts from which it might reasonably be concluded that a patient would be likely

to harm himself in the absence of preclusive measures, must use reasonable care to prevent such harm"); *Summit Bank* v. *Panos*, 570 N.E.2d 960, 969 (Ind. App. 1991) (reversing summary judgment in favor of defendant because, "[g]iven [the decedent's] history, and [the defendant's] own testimony of his awareness of her emotional problems, there is a genuine issue of fact whether it was foreseeable that [the decedent] might abuse the drugs which he prescribed for her"); *Fernandez* v. *Baruch*, 52 N.J. 127, 132, 244 A.2d 109 (1968) ("[t]he controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself"); *Champagne* v. *United States*, 513 N.W.2d 75, 76–77 (N.D. 1994) ("[i]f the patient's act of suicide is a foreseeable result of the medical provider's breach of duty to treat the patient, the patient's act of suicide cannot be deemed a superseding cause of the patient's death that breaks the chain of causation between the medical provider and the patient, which absolves the medical provider of liability").

Indeed, we have recently "adopted the standard set forth in § 442B of the Restatement [(Second) of Torts] that [w]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." (Internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 607–608, 662 A.2d 753 (1995).[6]

---

[6] In *Stewart*, the plaintiff's decedent was murdered by a third party in a parking garage owned and operated by the defendant. *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 234 Conn. 599. The defendant claimed that the trial court improperly refused to direct a verdict in its favor because the

Physicians have a duty to exercise the degree of care that physicians in that particular field would exercise in similar circumstances. If the physician's treatment of a patient falls below the relevant standard of care, liability may be imposed if it is reasonably foreseeable that suicide will result if such care is not taken. Accordingly, we hold that a physician may be liable for a patient's suicide when the physician knew or reasonably should have known of the risk of suicide and the physician's failure to render adequate care and treatment proximately causes the patient's suicide.[7]

The defendants nevertheless argue that their motion to set aside the verdict should have been granted

third party's actions constituted a superseding intervening cause that broke the chain of causation. Id., 610. In light of the criminal activities that had previously occurred in the defendant's garage, this court concluded that "the harm that befell [the plaintiff's decedent] had been reasonably foreseeable and within the scope of the risk created by the defendant's negligence." Id., 611–12.

[7] At oral argument, the defendants framed the issue in this case as whether a physician has a duty to prevent the suicide of a noncustodial patient. Although we conclude that there was sufficient evidence in this case that the defendants breached their duty owed to Edwards, we disagree with the defendants' characterization with respect to whether a physician has a duty to *prevent* suicide. We merely recognize that "a cause of action may exist for *professional malpractice* when a [physician's or other health care provider's] treatment of a suicidal patient falls below the standard of care for the profession, thus giving rise to a traditional malpractice action." (Emphasis in original.) *Nally* v. *Grace Community Church of the Valley*, 47 Cal. 3d 278, 295–96, 763 P.2d 948, 253 Cal. Rptr. 97 (1988). Indeed, were we to adopt the view that a physician has the duty to prevent a patient's suicide, even though the physician's treatment has conformed to or even surpassed the appropriate standard of care, imposition of liability in those circumstances would amount to strict liability. See id., 296 n.6 ("[i]f such were the case, psychiatrists could be held responsible whenever one of their patients made the unfortunate decision to take his own life").

The defendants further assert that because Edwards was not in their physical custody, the defendants cannot be liable unless the case falls within the uncontrollable impulse exception. See footnote 8. In our view, the circumstances in which a physician may be liable for a patient's suicide are not limited only to when the patient is in the physician's custody. Instead, the relevant inquiry is whether a defendant failed to provide reasonable treatment for the patient and that failure proximately resulted in the patient

because the plaintiff failed to prove the allegations of the complaint based on the uncontrollable impulse rule. Section 455 of the Restatement (Second) of Torts recognizes an uncontrollable impulse exception to the rule for those cases in which suicide constitutes an independent intervening cause that precludes liability. This rule provides for liability when the defendant's negligent conduct results in bringing about the tort victim's delirium or insanity, which prevents the victim from realizing the nature of his act of self-destruction, or if the suicide is the result of irresistible impulse. 2 Restatement (Second), Torts § 455 (1965);[8] see W. Prosser & W. Keeton, supra, § 44, pp. 310–11. In other words, "where the wrongful act produces such a rage or frenzy that the person injured by [a] defendant's wrongful act destroys himself during such rage or frenzy, or in response to an uncontrollable impulse, the act is . . . considered as within and a part of the line of causation from [the] defendant's wrongful act to the suicide and [the] defendant's act is held to be the proximate cause of the death." Annot., supra, 11 A.L.R.2d 756.

In support of this claim, the defendants focus on paragraph twelve of the second count of the plaintiff's amended complaint,[9] a fair reading of which is predi-

taking his or her life. See V. Schwartz, "Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry," 24 Vand. L. Rev. 217, 246 (1971) (asserting physician's liability for patient's suicide resulting from failure to provide adequate treatment should not be limited to custodial care).

[8] Section 455 of the Restatement (Second) of Torts (1965) provides: "If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity

"(a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

"(b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason."

[9] Paragraph twelve of the second count of the amended complaint provides: "As a result of the negligence of the defendant, Jeffrey Ettinger, the plaintiff's decedent, Agatha M. Edwards, was caused to become so severely

cated on common law negligence and invokes the uncontrollable impulse exception to the rule that suicide by a person during a lucid interval is an intervening cause. The defendants, however, take a narrow view of the complaint and disregard the theory upon which the plaintiff tried the case. In reading the complaint, we follow the modern trend, which "is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient . . . ." (Citations omitted; internal quotation marks omitted.) *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank,* 230 Conn. 486, 496, 646 A.2d 1289 (1994).

The defendants fail to recognize paragraph eleven of the second count,[10] which clearly raises several specifi-

---

depressed that, in a moment of uncontrollable impulse, she took an overdose of said Tofranil which caused imipramine poisoning and pulmonary edema of such severity as to result in her death."

[10] Specifically, paragraph eleven of the second count of the amended complaint provides: "The injuries, losses and subsequent death of the plaintiff's decedent, Agatha M. Edwards, were caused by the carelessness and negligence of the defendant, Jeffrey Ettinger, in one or more of the following ways:

"a. in that he failed to obtain a proper, accurate and complete medical history of the plaintiff's decedent prior to prescribing said Tofranil;

"b. in that he failed to perform a physical examination of the plaintiff's decedent prior to prescribing said Tofranil;

"c. in that he failed to administer any tests or diagnostic studies to make a proper and accurate diagnosis of the decedent's condition prior to prescribing said Tofranil;

"d. in that he undertook to treat the plaintiff's decedent for an emotional and/or psychiatric condition which was outside his field of specialization;

"e. in that he prescribed said Tofranil for the plaintiff's decedent, which medication was contraindicated by the decedent's alcohol abuse disorder;

"f. in that he prescribed a large dosage of Tofranil for the plaintiff's decedent despite the fact that her age and outpatient status contraindicated such a dosage;

"g. in that he failed to supervise, monitor or otherwise follow up on the health of the plaintiff's decedent after prescribing said Tofranil;

cations of medical malpractice—including allegations that Ettinger: (1) failed to obtain a proper, accurate and complete medical history of Edwards prior to prescribing Tofranil; (2) failed to perform a physical examination or administer any tests prior to prescribing Tofranil; (3) prescribed Tofranil when such medication was contraindicated by Edwards' alcohol abuse disorder; (4) prescribed an excessively large dosage of Tofranil for Edwards; (5) failed to supervise, monitor or otherwise follow up on Edwards' health after prescribing Tofranil; and (6) failed to require that Edwards come in for an office visit prior to prescribing the medication.

Indeed, not only was the case presented to the jury as a medical malpractice case,[11] but the defendants, in their argument to the trial court and then in their request to charge, acknowledged that the plaintiff's claim included medical malpractice. Because the complaint in paragraph eleven alleged medical malpractice—the underlying theory of the plaintiff's case and the theory upon which we rest our conclusions—the negligence allegation in paragraph twelve, insofar as it pleaded the uncontrollable impulse rule, was mere surplusage. "It is not necessary for a plaintiff to prove all that he alleges;

"h. in that he failed to require that the plaintiff's decedent come in for an office visit prior to prescribing said Tofranil, so that he could evaluate and assess both her physical condition as well as her emotional and psychological condition prior to the prescribing of said medication;

"i. in that he failed to refer the plaintiff's decedent for psychiatric treatment and/or suicide intervention services; and

"j. in that he failed to fully and adequately inform the plaintiff's decedent of the risks associated with taking said Tofranil."

[11] For example, the trial court commenced the jury instructions as follows: "In a medical malpractice action, the plaintiff must prove by a preponderance of the evidence these three essential elements: First, is the existence of a physician/patient relationship; secondly, the physician departed from the standard of care owed to the plaintiff, and this departure was the proximate cause of the plaintiff's harm."

it suffices if he proves enough to sustain the judgment." *Preston* v. *Preston*, 102 Conn. 96, 109, 128 A. 292 (1925).

Finally, the defendants argue that the trial court improperly denied the motion for judgment notwithstanding the verdict because the evidence was insufficient to support the jury's verdict. We disagree.

The standard for reviewing the denial of a motion for judgment notwithstanding the verdict is clear. "Our review of the trial court's refusal to [grant the motion] requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital*, supra, 207 Conn. 130.

The evidence presented to the jury in this case was sufficient to establish malpractice. The plaintiff produced expert testimony that suicide is a known symptom and risk in individuals suffering from depression. There was testimony that Ettinger's treatment of Edwards fell below the accepted standard of care for internists. Specifically, Ettinger prescribed a large dosage of Tofranil over the telephone to a patient he had never seen without having Edwards come in for a psychiatric evaluation and suicide assessment. Further, instead of arranging a psychiatric evaluation for Edwards within a few days after her telephone call, Ettinger suggested that she should call again to schedule an office visit. Indeed, the jury heard expert testimony that, had Ettinger conformed to the applicable standard of care, Edwards' death would have been prevented. Accordingly, we conclude that the trial court

did not abuse its discretion in denying the defendants' motion to set aside the verdict.[12]

The judgment is affirmed.

In this opinion the other justices concurred.

[12] We summarily dispose of one additional claim made by the defendants. The defendants argue that their expert, Charles Shook, an internist, was improperly impeached on cross-examination with respect to: (1) the commonality of malpractice insurance between Shook and Ettinger; (2) Shook's financial interest in Ettinger's insurer; and (3) Shook's past employment by the insurer. At the time of trial, the defendants objected solely on the basis of form and foundation, both of which they now abandon. Instead, the defendants now object because this cross-examination disclosed that Ettinger had malpractice insurance. The defendants did not raise this issue at trial; *Heritage Village Master Assn., Inc.* v. *Heritage Village Water Co.,* 30 Conn. App. 693, 703, 622 A.2d 578 (1993); and, therefore, we do not decide whether the evidence was properly admitted.