[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON ALL PENDING MOTIONS POST VERDICT
The sailor has the compass, Loran, the Southern Cross and the North Star to guide the ship. Jurors are asked to voyage upon seas just as stormy, but setting a course is less certain. When the summations and charge are said and done, the jury is left to its reason and common sense and the course to which honest deliberations direct it. In this case, presenting numerous questions of first impression, the jury's two verdicts showed a respect for the case presented, the law which governed and their oaths taken. The verdicts are therefore upheld by this court.
Before the court are post verdict motions filed by the plaintiff to set aside the verdict, for new trial or additur and the defendants' motion for judgment notwithstanding the verdict.
Because the jury could have reasonably reached the decision it did and no injustice was done, all such motions are denied.
Some discussion of the procedural history of the case is necessary. This is a wrongful death action brought under §52-555 of the Connecticut General Statutes by the plaintiff Douglas Brown as administrator of the estate of his late son, Gregory, who died in 1984. Defendants are Sergeant Patrick Dooling, III, Lieutenant Henry Povinelli, and Officers Edward O'Keefe and Frank Hosey, all of whom were Milford policemen at the time of plaintiff's decedent's death. § 52-555 does not create a separate cause of action in the deceased's survivors, but permits a plaintiff's cause of action to survive after his death and adds injuries which proximately caused his death.McKirdy v. Cascio, 142 Conn. 80, 84, 111 A.2d 555 (1955). The case was first brought in the U.S. District Court for the District of Connecticut. The federal court action was dismissed on June 20, 1989 with prejudice as to the civil rights claims but without prejudice as to any pendent state claims. The action was recommenced under Connecticut's Accidental Failure of Suit statute, § 52-592. However, no service of the writ was made CT Page 505 within the one year time period within which that statute requires such actions to be served. Instead, the plaintiff relying on a saving statute, Gen. Stat. § 52-593a, delivered the process to the sheriff on what the jury could have found was the last day for service and the sheriff then served the process within the statutorily required 15 days of receiving it on all four individual defendants. This court held at trial that Gen. Stat. § 52-593a applied to cases like this which are recommenced under the accidental failure of suit statute after having been dismissed without prejudice by a federal court, because § 52-593a is a remedial statute designed to toll the applicable statute of limitations if the process commencing or so recommencing the lawsuit was timely delivered to the sheriff. At an earlier time, the action against the City of Milford was struck by the court, McGrath, J., and the plaintiff did not replead within the time permitted by law and withdrew against the City of Milford immediately prior to the commencement of evidence. The case was then bifurcated and the jury rendered general plaintiff's verdicts against all defendants on liability only. The jury then heard evidence as to damages from the decedent's mother and an economic expert and awarded nominal damages of one dollar in favor of the plaintiff and against all defendants. The plaintiff now moves, pursuant to Practice Book § 320, to set aside the damage verdict, for a new trial and/or additur. The defendants, pursuant to Practice Book § 321, move to set aside the verdict, and notwithstanding the verdict, to render judgment in favor of the defendants in accordance with their motion for directed verdict.
The plaintiff's decedent, Gregory Brown, committed suicide utilizing a shotgun, and the action before the court was brought by his fiduciary against four police officers who responded to a complaint of a possibly suicidal person at the home address of the deceased. The evidence was in conflict as to whether the police officers knew that the person who had called a fire department emergency line had identified Gregory Brown as the person contemplating suicide. The jury could have found that Gregory was a latchkey child who was left alone from the time he arrived home from school until the time a parent returned home. He had experienced continuing difficulties in school and his parents suspected a report card had been forged to make it appear his grades were passing when in fact he was flunking. It turned out their suspicions were right. Gregory was sent to school and his parents let it be known that they would check on the authenticity of the reported grades that day with school CT Page 506 personnel. Young Gregory learned in school that his fraud would be reported to his parents. After dismissal of students because of the end of the school day, Gregory Brown told neighborhood friends he was considering suicide rather than face parental discipline. One of them called a fire department emergency line telling the fire dispatcher that he feared his friend Gregory Brown was going to take his life. The caller's name and telephone number could not be confirmed by the police, although they attempted to do so. Ultimately, the call was routed through another fire dispatcher to a police dispatcher and to three different policemen. What was lost in the translation was at issue. In any event, police investigated. They did not call a parent or take other means to protect his life. They concluded Brown was the victim of a hoax call. That was in part based on his calm demeanor, cooperative attitude and denial that the family kept any firearms, although there were guns and ammunition all over the house. After they left the premises, Gregory Brown killed himself with a shotgun, leaving behind a suicide note.
While municipal employees generally have qualified immunity from tort liability for the performance of discretionary acts, an exception has been recognized where the circumstances have made it apparent to the employee that the failure to act would be likely to subject an identifiable person or narrow class of persons to imminent harm. Burns v. Board of Education,228 Conn. 640, 645, 638 A.2d 1 (1994).
The imminent harm exception is the only exception which seems pertinent since no other exception to the general qualified immunity accorded to such officers is invoked by the complaint. All parties in their briefs conceded this was the issue.
The court excluded evidence in limine of matters which might have been revealed by further investigations or searches because the determination of the imminent harm to identifiable person exception to governmental immunity must be judged on what was apparent and readily seen by the defendant officers, not on what was not so-visible. Burns, supra.
The municipal officer is immune for discretionary actions taken in good faith except where circumstances he has seen or heard have made it apparent to him that some identifiable person or class of persons is in imminent peril if he or she fails to act. "Apparent" is defined in the New College Edition of theAmerican Heritage Dictionary of the English Language as "(1) CT Page 507 readily seen, open to view, visible; (2) readily understood or perceived, plain or obvious."
After careful review of the many appellate decisions in this area of the law, the court is convinced that this interpretation based on the ordinary meaning of "apparent" is consistent with the various opinions which set out the governmental immunity doctrine and the exceptions which the law draws to its application.
As creatures of the state, towns and cities have no sovereign immunity from suit. Murphy v. Ives, 151 Conn. 259, 264,196 A.2d 596 (1963). They do enjoy a limited governmental immunity from liability when engaged in governmental functions; Couture v.Board of Education, 6 Conn. App. 309, 312, 505 A.2d 432 (1986); but not for proprietary functions unrelated to municipal status as representative of the state and not for ministerial acts. SeeR.A. Civitello Co. v. New Haven, 6 Conn. App. 212, 504 A.2d 542
(1986). Where engaged in discretionary governmental acts, municipal officials may be statutorily liable, if a statute imposes such liability on the officer. Gordon v. BridgeportHousing Authority, 208 Conn. 161, 167, 544 A.2d 1185 (1988). Liability may also be imposed for malicious, wanton or intentional acts. Ministerial acts involving duties which are to be performed in a prescribed manner without the exercise of judgment or discretion may result in liability due to acts or omissions of municipal employees. Tango v. New Haven,173 Conn. 203, 205, 377 A.2d 284 (1977). However, where discretionary acts are involved, such as determinations by the police as to whether in their judgment there is any substance to a report of a possible suicide, they are to be held immune from liability except in those situations where it is apparent to them that failure to act will subject an identifiable person to imminent harm. Sestito v. Groton, 178 Conn. 520, 528, 423 A.2d 165 (1979);Shore v. Stonington, 187 Conn. 147, 153, 444 A.2d 1379 (1982). The Shore court recognized that, in matters of discretion or judgment, where society expects a municipal officer to exercise such discretion or judgment, so that the law is enforced with common sense rather than with the absolutism of a police state, "the public interest is [not] served by allowing a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a policeman's discretionary professional duty. Such discretion is no discretion at all." Shore, supra, 187 Conn. 157. This is particularly so where the second guessing is done on the basis of information or circumstances not known or obvious or readily CT Page 508 visible to the police personnel when they were called to the home and involved in making the determination whether Gregory Brown or any other person on the premises was in imminent peril of taking his own life. The jury was therefore charged in accordance with these legal principles.
In determining a motion for judgment notwithstanding the verdict or a motion to set aside the verdict, the court must look to the evidence and view it most favorably to the nonmoving party in determining whether the jury could have reasonably reached the result that it did.
Here, the police officers testified that they had a duty to protect people who were suicidal from themselves if they saw they were in danger of imminently harming themselves. How far to investigate a complaint is a matter of police discretion and necessarily so. If the police were to employ exhaustive investigations in every complaint as a bureaucratic technique to avoid all future criticism or liability, the cost in intrusion on civil liberties would be intolerable in a free society. In this case, the liability pled was that resulting when police fail to act when it is apparent to them that failure to act would subject an identifiable person to imminent harm. If proved, it can result in civil liability of municipal police officers even for discretionary acts. Sestito v. Groton, supra, 178 Conn. 528;Shore v. Stonington, supra 187 Conn. 156-57. The court therefore determined there was a duty to the deceased, if the jury found it was apparent to the police that their failure to act would subject Gregory Brown to imminent harm, and left it to the jury to determine the factual dispute as to whether there was violation of that duty. Gordon v. Bridgeport Housing Authority,
supra. Although the United States Supreme Court recognized no constitutional affirmative duty on the part of a state to protect a person in some known predicament or from the state's expression of stated intent to be of help in a noncustodial situation, where the state played no part in the creation of the harm or making the plaintiff more vulnerable to it, nonetheless it recognized that there may be such a duty under state tort law. DeShaney v.Winnebago County Social Services Department, 489 U.S. 189 (1989). Under Connecticut tort law, the case at bar also presented novel questions as to the interplay of the death statute, § 52-555, the nature of the act of suicide, and issues of proximate cause, superseding cause, and foreseeability as they relate to such a death action when the cause of that death is suicide. Since Connecticut's death statute does not create a cause of action in CT Page 509 the parents of the deceased but continues an action which the deceased might otherwise have had, had he lived, the effect of such a death action arising out of suicide is that the person who succeeded in taking his own life is permitted after death through an executor acting on his behalf to sue for damages from the police for their failing to prevent his own self-destruction. "[W]here an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render [the] defendant civilly liable. In other words, suicide generally is an unforeseeable result that serves to preclude civil liability." (Internal quotations and citations omitted.) Edwards v. Tardif,240 Conn. 610, 615, 692 A.2d 1266 (1997). In Edwards, our Supreme Court chose to carve out exceptions to the general rule of nonliability. It stated: "Conversely, suicide will not break the chain of causation if it was a foreseeable result of the defendant's tortious act." Id., 616. "[T]he controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself." (Internal quotation marks omitted.) Id., 617. Police discretion results in a defense of governmental immunity to claims of negligence unless in a case it is apparent to the officer that imminent harm will result to an identifiable person if the officer fails to act. This means the jury was to consider what was apparent to each police officer. The evidence is in conflict in this case as to whether particular officers were told while they were at the house that Gregory Brown was the person whom the fire department was called about and whether or not by inference Officer Hosey, having looked in a closet where at least the butt of a shotgun was exposed, should, in taking view of that, have concluded that guns were present.
If Brown's name as the potential suicide was told to a defendant policeman and he didn't listen to or appreciate what was said or a shotgun or a butt part of it sufficient to identify it was there in the closet and Hosey ignored it, these facts were apparent to those individual police officers, nonetheless, by being readily visible or readily understood.
Conversely, of course, there was evidence that they had no such knowledge and there was nothing there to be seen. But those were jury issues which the jury could have resolved in the plaintiff's favor. CT Page 510
The court, therefore, agrees with the defendants that the defendants are chargeable with what was actually known to them but disagrees that that is where the matter ends because it holds they were also chargeable with knowledge of things said to them or which they looked at and did not take reasonable cognizance of. A police report which was prepared the day after the death by Sgt. Dooling, in referring to events when they first arrived at the Brown house, stated in part: "Officer O'Keefe was on the phone with headquarters attempting to obtain additional information. The only information obtained was the name Greg Brown." When asked what he meant by that, the following exchange occurred:
 "A. Okay, this information was relayed to me by Officer O'Keefe. The information about Greg Brown was the fact that at this point we're looking into who made the phone call. So the information received was possibly Greg Brown could have made the phone call from that residence.
 Q. So your testimony was that O'Keefe told you that Greg was identified as a suspect from headquarters?
 A. I don't know where he got that information from. I assume it was from headquarters.
 Q. Well, based on your report, where do you think that information came from? I mean you wrote `he was on the phone with headquarters attempting to obtain additional information. The only information was the name Greg Brown.' Greg Brown, that name came from headquarters. Didn't it?
A. That came from Officer O'Keefe.
Q. Who told you he got it from headquarters?
 A. I believe he was on the phone with headquarters at the time."
Additionally, the jury could have determined that there was knowledge that a young boy was found at the house who turned out to be age 13 and that the call to the fireman had been made by a person estimated to be 14 or 15 years old who described the person in danger as a friend. CT Page 511
There was also testimony from Mr. Douglas Brown, father of the deceased, that a long gun was kept in a bedroom closet which Officer Hosey said that he looked into. Douglas Brown also testified that one who looked into the closet could see the butt of this shotgun beneath hanging clothes. A part of certain things can be so distinctive and essential so as to identify the whole. As one who sees only an elephant's trunk around a corner knows there is an elephant there, so an exposed shotgun butt is an essential part of the weapon, unique enough to alert the observer that a gun was present.
There was evidence before the jury from which it could have concluded that failure to act on the policemen's part would subject an identifiable person, Gregory Brown, to imminent harm, and that their failure to call parents or otherwise protect him from harm was a proximate cause of death. Under our applicable law it is enough if such a municipal officer is a substantial factor in causing harm and a cause in fact. The plaintiff need not prove a defendant was the only cause of injury or damage.Coburn v. Lenox Homes, Inc., 186 Conn. 370, 383, 441 A.2d 620
(1982).
The court therefore denies the defendants' motion for judgment notwithstanding the verdict.
The court will now turn to the plaintiff's motions addressed to what it alleges was the legal inadequacy of the verdict amount rendered. The plaintiff's post verdict motions attack the award of only $1.00 in compensatory damages.
The jury was charged on nominal damages without exception an follows:
"Because you have found liability already, meaning that there has been a finding by you that there has been an invasion of the decedent's rights by the acts or omissions of the defendants, if you should find that the plaintiff has not proved he suffered any actual damages, such a finding would not end the matter because this is one of those cases where the law provides what are sometimes called, more or less actually, nominal damages. From the mere invasion of the decedent rights, the law would import some damages to him.
If you do not find proven any substantial damages but you do find there is an invasion of the plaintiff's rights, it is your CT Page 512 duty to bring in a verdict for the plaintiff stating some nominal sum, for example, one dollar, as the amount which he should recover. By so doing, you will determine the rights of the parties which in this kind of case is important."
In a death case brought under § 52-555 of the statutes, damages may be awarded for (1) reasonable funeral expense; (2) destruction of the ability to carry on and enjoy life's activities; (3) loss of net income over the probable lifeexpectancy of the deceased; (4) conscious pain and suffering incurred between the onset of the injury and death; and finally (5) damages for the death itself. The plaintiff argues that the damage verdict should be set aside, because as a matter of law a life is worth more than $1.00 once a jury has found a defendant was a substantial factor in causing death. The court disagrees. Even in this jaded society, where human life is not always respected, the objective observer must acknowledge that a human life is not only a precious but a priceless thing. The question before the court was not to determine whether human life in the abstract is a valuable thing but what damages were proved by the plaintiff to have resulted to Gregory Brown by virtue of the failure of the defendants to prevent his self-inflicted death. The plaintiff was obligated to prove damages. The jury could reasonably have found that he did not so do.
The court will first address itself to the funeral expenses. The plaintiff claimed no damages for the funeral bill, offered no evidence of it, and therefore this item of damage was not in the case.
The court charged on the second element of destruction of life's activities. To prove this element of damages, the plaintiff was required to establish that the deceased engaged in life's enjoyable activities and the probable span of future life over which they would be lost. Sims v. Smith, 115 Conn. 279,161 A. 239 (1932). Although there was evidence before the jury that the deceased enjoyed working with computers, small pets and animals, friends and similar boyhood activities, there was much contrary evidence to justify the jury's verdict of only nominal damages for this element of the case. On the day of death, he had considered running away from home or suicide. His previous academic performances in schooling were consistently poor or failing. His records from the Milford Mental Health Center indicate he had difficulty in showing emotion or communicating with others. He had thrown matches at classmates and fooled with CT Page 513 sharp objects in his mouth, on one occasion mouthing the razor portion of a manual pencil sharpener. In 1980 he was assessed by A. Herbert Schwartz, M.D., as "perhaps self-destructive or destructive of others." He had difficulty in concentration and keeping the normal attention span. All of this was evidence of a lack of enjoyment of his life. In determining what was the value of the destruction of the deceased's ability to carry on life's activities, the jury was confronted with a difficult task. It was up to the plaintiff to prove not just the proximate cause but also the amount of such damages. The jury was entitled to look at the overall picture of the decedent's activities in determining how pleasurable the decedent's future might have been. Waldron v.Raccio, 166 Conn. 608, 353 A.2d 770 (1974). In viewing the strong evidence of the malaise and general unhappiness of young Gregory Brown, the jury could have reasonably found that he had little enjoyment of life's activities while he lived, and therefore as to claimed loss of enjoyment of life's activities by virtue of death the jury could have found that the plaintiff had only proved nominal damages. The jury could have concluded that not only did the deceased suffer from lack of enjoyment of life but that the probable duration of his life was short or unproved. The jury therefore could have found for the defendants on this issue.
The jury was also charged about the third statutory damage element consisting of loss of net earning capacity after allowance for taxes and cost of his own maintenance from the age of 18 for the probable duration of his life. The jury could have reasonably considered he suffered from self-destructive tendencies and that the plaintiff had not proved he would live to be 18, much less beyond it. Because the plaintiff's expert admitted taking no account of the particular situation of the deceased's malaise or poor school performance or other pertinent aspects of Gregory Brown's life, the jury was not bound by the opinions of the expert. There is a relation between the education level one attains and the likely future earnings of such a person. The evidence in this case could have reasonably left the jury in serious doubt that the deceased would graduate from elementary school much less high school, college or graduate school. The jury could also have reasonably concluded that his probable future life expectancy had he not died by his own hand was not proved. Jurors therefore could have reasonably concluded that the plaintiff had not proved this element of damages.
The court charged out of the jury's considerations any consideration of the fourth statutory element, namely damages for CT Page 514 conscious pain and suffering prior to death. The only evidence was that the deceased had used a shotgun to blast away a substantial part of his cranium and brain and that death was therefore instantaneous, and devoid of conscious pain and suffering.
Finally, as to the last element of damages, the plaintiff urges that the $1.00 awarded for the death itself is insufficient as a matter of law. He points out that Rhode Island's Wrongful Death Statute, Title 10, Chapter 7, Section 2 provides that in any death case where liability is found the damages shall be "not less than $100,000.00." Connecticut has no such statutory minimum. Until enactment of the present death statute, Connecticut's statutory scheme put a dollar ceiling on recovery, but never provided for a Rhode Island type floor. T. Koskoff,"Stare Decisis — And The Rule in Death Cases," 31 Conn. B.J. 315, 317 (1957). Our Supreme Court has observed that "assessing damages for wrongful death defies any precise mathematical computation." Floyd v. Fruit Industries, 144 Conn. 659, 669, 136, A.2d 918, (1957). Damage in a death action for the death itself has not been defined by our appeals courts and the distinction is not easily appreciated between the damages a jury might award for the death itself as opposed to the effects of that death otherwise provided for by statute. Where instantaneous death occurs by suicide, in assessing damage for the death itself, this court holds that the jury could consider that the defendants' liability to Gregory Brown's estate was premised only on the defendants' failure to prevent what Gregory Brown intended to cause and did himself cause. The jury could also consider that the decedent had come to a point where life itself was unendurable. Despite the normal instinct we all have to value and preserve life, particularly our own, the jury could have reasonably found that the deceased himself put little value on continued existence, and set out to end his own life. There was evidence before the jury that Gregory misled both the police and a close friend about his intentions — the police by telling them that the family kept no guns; the friend next door by telling him after the police left and just before he shot himself that he was going to start his homework. The jury could have concluded that Gregory Brown tragically did not wish to be deterred from taking his own life by parents, friends or the police and that he no longer wished to live. Therefore, nominal damages for the death itself could be reasonably awarded based upon all of the evidence. CT Page 515
For all of these reasons, the court finds that the jury could have reasonably and justly reached the result that it did in determining that although the plaintiff has proved the defendants were a proximate cause of Gregory Brown's death by failing to call his parents or otherwise act to prevent it, the plaintiff had not proved resulting damages.
The plaintiff's motions for additur, new trial, and to set aside the damages verdict are denied.
Flynn, J.