Sherry ALMONTE et al.

v.

Rita S. KURL, M.D. et al.

No. 2010–315–Appeal.

Supreme Court of Rhode Island.

June 26, 2012.

David J. Oliveira, Esq., Providence, for Plaintiffs.

Michael G. Sarli, Esq., Providence, for Defendants.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

This appeal arises from a wrongful death action brought pursuant to G.L.1956 chapter 7 of title 10;[1] the plaintiffs set forth allegations of medical negligence in their complaint. That civil suit and the eventual trial occurred in the wake of the tragic suicide of Peter Almonte on September 5, 2000, approximately thirty-six hours after he was discharged from a hospital emergency room. The case was tried to a jury in February of 2009 in the Superior Court for Providence County.

After a full trial and after instructions having been provided by the trial justice, the jury deliberated and then returned a verdict of no negligence on the part of one of the defendants, Rita S. Kurl, M.D.[2] After that verdict was rendered, plaintiffs[3] moved for a new trial pursuant to Rule 59[4] of the Superior Court Rules of Civil Procedure,[5] and defendants renewed their previously made motion for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure.[6] The trial justice rejected the jury's finding

1. General Laws 1956 § 10–7–1 provides as follows:

 "Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who, or the corporation which, would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony."

2. Since plaintiff's brought a claim against St. Joseph Hospital (*see* Section I B, *infra*) under a *respondeat superior* theory, the hospital's liability (*vel non*) is dependent on that of its employee, Dr. Kurl.

3. Sherry Almonte was a plaintiff both individually and as the mother and natural guardian of Nicole, Michael, and Michelle Almonte.

4. Rule 59 of the Superior Court Rules of Civil Procedure reads in pertinent part as follows:

 "(a) *Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state."

5. In addition to the motion for a new trial that is referenced in the text, plaintiffs also moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. The denial of that motion, however, is not at issue in the instant appeal.

6. Rule 50 reads in pertinent part as follows:

 "(b) *Renewal of Motion for Judgment After Trial; Alternative Motion for New Trial.* Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may

as to the absence of negligence; however, she granted defendants' Rule 50 motion because she concluded that plaintiffs had failed to establish causation by a preponderance of the evidence. She accordingly denied plaintiffs' motion for a new trial.

On appeal, plaintiffs contend that the trial justice erred (1) in granting defendants' Rule 50 motion for judgment as a matter of law; (2) in refusing to give jury instructions with respect to the doctrine of spoliation; (3) in refusing plaintiffs' request for an evidentiary presumption on the issue of causation; and (4) in denying plaintiffs' Rule 59 motion for a new trial.

# I

## Facts and Travel

### A

### General Laws 1956 § 40.1-5-7

The instant case involves the application of G.L.1956 § 40.1-5-7. That section provides in pertinent part as follows:

"(a) *Applicants.* (1) Any physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, *may apply at a facility for the emergency certification of the person thereto.* The medical director, or any other physician employed by the proposed facility for certification may apply under this subsection if no other physician is available and he or she certifies this fact. * * * Application shall in all cases be made to the facility which in the judgment of the applicant at the time of application

would impose the least restraint on the liberty of the person consistent with affording him or her the care and treatment necessary and appropriate to his or her condition.

" * * * *

"(b) *Applications.* An application for certification hereunder shall be in writing and filed with the facility to which admission is sought. The application shall be executed within five (5) days prior to the date of filing and shall state that it is based upon a personal observation of the prospective patient by the applicant within the five (5) day period. * * * Whenever practicable, prior to transporting or arranging for the transporting of a prospective patient to a facility, the applicant shall telephone or otherwise communicate with the facility to describe the circumstances and known clinical history to determine whether it is the proper facility to receive the person, and to give notice of any restraint to be used or to determine whether restraint is necessary.

"(c) *Confirmation; discharge; transfer. Within one hour after reception at a facility, the person regarding whom an application has been filed under this section shall be seen by a physician. As soon as possible, but in no event later than twenty-four (24) hours after reception, a preliminary examination and evaluation of the person by a psychiatrist or a physician under his or her supervision shall begin. The psychiatrist shall not be an applicant hereunder. The preliminary examination and evaluation shall be completed within seventy-two (72) hours from its incep-*

---

be renewed by service and filing not later than 10 days after entry of judgment. * * * If a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law."

*tion by the psychiatrist. If the psychiatrist determines that the patient is not a candidate for emergency certification, he or she shall be discharged. If the psychiatrist(s) determines that the person who is the subject of the application is in need of immediate care and treatment and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, he or she shall confirm the admission for care and treatment under this section of the person to the facility,* provided the facility is one which would impose the least restraint on the liberty of the person consistent with affording him or her the care and treatment necessary and appropriate to his or her condition and that no suitable alternatives to certification are available. If at any time the official in charge of a facility or his or her designee determines that the person is not in need of immediate care and treatment, or is not one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, or suitable alternatives to certification are available, *he or she shall immediately discharge the person.* In addition, the official may arrange to transfer the person to an appropriate facility, if the facility to which he or she has been certified is not one which imposes the least restraint on the liberty of the person consistent with affording him or her the care and treatment necessary and appropriate to his or her condition.

"(d) *Custody.* Upon the request of an applicant under this section, to be confirmed in writing, it shall be the duty of any peace officer of this state or of any governmental subdivision thereof to whom request has been made, to take into custody and transport the person to the facility designated, the person to be expeditiously presented for admission thereto.

" * * *

"(f) *Notification of rights.* No person shall be certified to a facility under the provisions of this section unless appropriate opportunity is given to apply for voluntary admission under the provisions of § 40.1–5–6 and unless he or she, or a parent, guardian or next of kin, has been informed, in writing, on a form provided by the department, by the official in charge of the facility: (1) that he or she has a right to the voluntary admission; (2) that a person cannot be certified until all available alternatives to certification have been investigated and determined to be unsuitable; and (3) that the period of hospitalization or treatment in a facility cannot exceed ten (10) days under this section, except as provided in subsection (g) of this section.

"(g) *Period of treatment.* A person shall be discharged no later than ten (10) days measured from the date of his or her admission under this section, unless an application for a civil court certification has been filed and set down for a hearing under the provisions of § 40.1–5–8, or the person remains as a voluntary patient pursuant to § 40.1–5–6." (Emphasis added.)

## B

### The Plaintiffs' Complaint

On September 4, 2003, plaintiffs filed a complaint in the Superior Court against defendants, Rita S. Kurl, M.D., and St. Joseph Hospital.[7] In their complaint,

---

7. The City of Cranston and Police Sergeant Cooke, alias, were also named as defendants in the complaint; however, by the time of

plaintiffs stated that they were the family of Peter Almonte, who committed suicide on September 5, 2000. The plaintiff Sherry Almonte was the decedent's wife; and Nicole, Michael,[8] and Michelle were their children and are also plaintiffs in this case. The plaintiffs alleged that, on or about September 4, 2000, Mr. Almonte had experienced a severe psychological episode, which resulted in a confrontation at his home and "his expression of a wish to die." The plaintiffs further alleged that, as a result, officers of the Cranston Police Department brought Mr. Almonte to Our Lady of Fatima Hospital, a unit of St. Joseph Health Services of Rhode Island, Inc. (hereinafter Fatima Hospital), so that he might undergo a psychological evaluation. According to plaintiffs' complaint, after approximately one hour and forty minutes, "the hospital personnel decided to honor [Mr. Almonte's] demand to be discharged, by discharging him into the care of Cranston Police Officers."

In their complaint, plaintiffs alleged that Mr. Almonte's treating physician (Dr. Rita S. Kurl, one of the defendants) breached the duty that she owed to him pursuant to the physician/patient relationship. They further contended that, as a "direct and approximate [*sic*] result" of Dr. Kurl's breach of that duty, Mr. Almonte suffered "severe personal injuries resulting in his death" and also resulting in damages to plaintiffs. Accordingly, plaintiffs brought

wrongful death actions pursuant to chapter 7 of title 10 against Dr. Kurl and St. Joseph Hospital. The claims brought against St. Joseph Hospital, which was Dr. Kurl's employer, were premised on a *respondeat superior* theory.

## C

### The Testimony at Trial[9]

#### 1. The Testimony of the Responders

The trial in the Superior Court began on February 9, 2009. At that trial, Lieutenant Vincent McAteer of the Cranston Police Department testified that, on September 3, 2000, he received a call reporting "a suicidal male," and he accordingly responded to the call. Lieutenant McAteer stated that he was notified by the dispatcher that Mr. Almonte had expressed that he wanted to kill himself and that he had left his house; the lieutenant and other officers then searched the area around the Stone Hill School for approximately one hour before being advised that Mr. Almonte had returned to his residence. They then encountered Mr. Almonte in his garage and briefly spoke with him, at which time Lieutenant McAteer told the dispatcher to call Cranston Rescue as a result of Mr. Almonte "express[ing] to [the lieutenant] and the other officers that he wanted to kill himself."

Captain Lawrence Caron of the "Cranston rescue/fire department"[10] testified

---

trial, those parties were no longer defendants in the case.

We additionally note that plaintiffs refer to St. Joseph Hospital as St. Joseph's Hospital in their complaint. In its answer, however, the hospital stated that its "correct corporate name" is "St. Joseph Health Services of Rhode Island, Inc." The documents admitted into evidence from Mr. Almonte's hospital record provide "St. Joseph Hospital" as the hospital's name. For the sake of simplicity and clarity, we shall hereinafter refer to that hospital as St. Joseph Hospital.

**8.** All references hereinafter to "Mr. Almonte" apply to the decedent, Peter Almonte, and not to his son, Michael.

**9.** We have described what transpired in the Superior Court to the extent pertinent to the instant appeal.

**10.** Both at the time of his response to the Almonte residence in September of 2000 and at the time of trial, Captain Caron was an emergency medical technician (EMT) employed by the City of Cranston.

that he became involved in the incident concerning Mr. Almonte when he was called by the Cranston police to respond to a certain location for what he referred to as a "psychological problem." Captain Caron proceeded to testify that, upon his arrival, the police officers gave him a brief synopsis of the events that had occurred and requested that he take Mr. Almonte to Fatima Hospital for an evaluation.

Lieutenant McAteer stated that he accompanied Mr. Almonte to the rescue vehicle and told him that he was sending him to the hospital because "he had expressed [that] he wanted to end his life and * * * we needed to get him help as a result of that." On cross-examination, the lieutenant further testified that the officers "made [Mr. Almonte] go to the hospital [because] he stated that he wanted to kill himself." According to Captain Caron, while Mr. Almonte was being driven to the hospital, he seemed "quite calm" and "[a]lmost * * * a little embarrassed over the whole situation that he was going through."

## 2. The Testimony of the Emergency Department Nurses

Paula Trudel, a registered nurse employed by St. Joseph Hospital, testified at trial. She affirmed that, on September 3, 2000, she was working the night shift [11] in the Fatima Hospital emergency department. Nurse Trudel [12] testified that Mr. Almonte arrived at the emergency room at 1:10 a.m. (on September 4); she added that she evaluated him in a room that was separate from the triage area due to the

fact that alcohol and psychiatric issues were potentially involved. Nurse Trudel also testified that she learned that Mr. Almonte had been taking Prozac because "he had a psychiatric history and was being treated for it." She affirmed that, on the basis of a report from an EMT, she became aware that someone from the Almonte family was concerned that Mr. Almonte was going to harm himself with a gun.

Nurse Trudel testified that she had recorded Mr. Almonte's "chief complaint" as being "psyche eval." She stated that that notation in the record was meant to communicate "a need for the physician to address the patient's psyche." Nurse Trudel additionally recorded "ETOH," [13] and she testified that she could smell alcohol on Mr. Almonte's breath. She also stated that she had recorded the fact that there was a question as to whether or not Mr. Almonte had intended to harm himself—because he had presented with a history of depression and increased stress and because he had "stated to [her] that he was playing with guns." [14] In addition, on cross-examination, Nurse Trudel testified that, with respect to the portion of the chart entitled "Neurological," she had assessed Mr. Almonte to be "alert and oriented to person and place and time." Nurse Trudel further testified that she never discussed Mr. Almonte with Dr. Kurl.

William Falvey, a registered nurse employed by St. Joseph Hospital, also testi-

11. The testimony of Nurse William Falvey indicates that the "night shift" extended into the early morning hours of September 4.

12. Nurse Trudel relied upon her triage notes and the "ambulance sheet" to assist her in recalling her interaction with Mr. Almonte in the emergency room.

13. According to the testimony of Nurse William Falvey, ETOH is an abbreviation for "ethyl alcohol" and indicates a need for "alcohol laboratory studies."

14. Nurse Trudel testified that it was Mr. Almonte who used the expression "playing with guns" (as quoted in the text).

fied at trial.[15] He stated that, on September 3 and 4, 2000, he was working the 11 p.m. to 7 a.m. shift as a core nurse at Fatima Hospital.[16] Nurse Falvey testified that, in view of the fact that his own individual notes as well as those of Nurse Trudel and Dr. Kurl all reflect that the taking of those notes began at approximately 1:10 a.m. on September 4, he could conclude that Nurse Trudel, Dr. Kurl, and he were together with Mr. Almonte shortly after his arrival in the emergency department. Nurse Falvey proceeded to testify that one of his responsibilities was to draw specimens that would be sent to the laboratory for analysis. He further testified that he made "slash marks" next to the following categories on Mr. Almonte's patient chart: "blood count with differential, basic metabolic;" "alcohol;" and "urine tox screen." Nurse Falvey stated that it was his practice to put "slash marks" when he carried out a physician's orders. Based on the fact that the labels for the specimens were printed at 1:23 a.m., Nurse Falvey testified that his initial interaction with Mr. Almonte ended at approximately 1:20 or 1:21 a.m. on September 4.

According to his own notes, Nurse Falvey subsequently left Mr. Almonte's room and sat at the nurses' station, from which vantage point he could still view the patient's room. Nurse Falvey testified that, at some later point in time, Mr. Almonte approached him at the nurses' station. Nurse Falvey further testified that, based on his records from that morning, Mr. Almonte, after making a telephone call, said to him: "No way I'm staying in this f* * * place. I came here voluntarily. I'm leaving." With respect to the just-quoted language, Nurse Falvey testified that, again based on his records, he responded to Mr. Almonte by advising him to wait for medical clearance.[17] Nurse Falvey stated that, at that point in time, Mr. Almonte did not become violent; with respect to the language used by his patient, Nurse Falvey stated: "That type of language is common with alcoholic intoxication."

Nurse Falvey proceeded to testify that, at 1:50 a.m., the time of the next entry in his records, he received a call from Sgt. Cooke of the Cranston Police Department. Nurse Falvey testified that his record concerning that call read as follows:

"Call from Cranston PD, Sergeant Cooke. Sergeant Cooke reports [Mr. Almonte], quote, 'had a gun wrestled from him,' end quote, and indicated would send cruiser for Mr. Almonte. Dr. Kurl aware. And patient continues to deny suicidal ideations. Appears sober, speech clear and concise, ambulates well."

Both Nurse Trudel and Nurse Falvey testified that, with respect to certain previous patients, they had observed mental health services being contacted so that a psychological assessment could be performed. However, according to Nurse Trudel, there was no overnight psychological coverage in the emergency department. Nurse Falvey testified that, in his experience, there were four different results with respect to mental health services during off hours: (1) a mental health professional

---

15. Nurse Falvey testified that he had no memory "whatsoever" of Mr. Almonte's stay in the emergency room; he therefore relied on the patient's chart to answer questions.

16. As defined in a question posed to Nurse Falvey, a core nurse provides "patient care in the actual emergency room phase."

17. Nurse Falvey stated that, by the term "medical clearance," he meant that, before leaving, Mr. Almonte "should wait for the physician's clearance, wait for the lab work to come back."

would come to the hospital and perform a psychiatric evaluation; (2) a mental health professional would have a conversation by telephone with a physician, leading to a joint decision; (3) a mental health professional would speak with the patient by telephone; or (4) the patient would be held until a mental health professional was available.

Nurse Trudel testified that she could not recall whether, on September 4, 2000, anyone contacted mental health services regarding Mr. Almonte. She acknowledged in response to a question posed by plaintiffs' counsel that, looking at the chart, there was no order from a physician ordering such contact. Similarly, Nurse Falvey testified that he had no knowledge of contact with an outside mental health service having been made, and he stated that he had not recorded making such a contact in his chart—as he would have done if a physician had requested that he make such a contact.

### 3. The Testimony of Rita S. Kurl, M.D.

At trial, Dr. Rita S. Kurl, a defendant who was called as a witness by both plaintiffs and defendants, testified as to her experience with Mr. Almonte. She testified that, on the morning of September 4, 2000, Mr. Almonte arrived by ambulance at Fatima Hospital's emergency department. The doctor further testified that, upon Mr. Almonte's arrival, the ambulance crew presented her with a "run report," which she signed. Doctor Kurl testified that the narrative on the run report read as follows:

> "Patient history of depression, complains of increased stress, ETOH, Cranston police department, CPD on scene. Family concerned patient was going to harm himself with gun. Patient cooperative. Denies intent."

Doctor Kurl testified that she remembered that the triage report concerning Mr. Almonte stated that he was in the emergency room in order to undergo a psychiatric evaluation. She additionally stated that the patient's record also referred to an "evaluation" as constituting the "chief complaint."

Doctor Kurl stated that she met with Mr. Almonte twice; the first time was to interview him, and the second time was to meet with him to advise him as to the outcome of his visit. Doctor Kurl additionally affirmed that she ordered that blood and urine samples be taken from Mr. Almonte. Doctor Kurl testified that her "provider notes" with respect to Mr. Almonte read as follows:

> "39–year–old male and in police custody, brought to ER via rescue. Had been drinking steadily and was involved in a fight at home with wife. Had threatened to shoot them.
> "* * *
> "Initially, on arrival, patient states: 'I don't want to be evaluated. I am drunk. I am not suicidal. I do not want to be seen.' Patient was told we will get blood workup and then police will decide. Once discussed with patient, patient calm and cooperative."

Doctor Kurl testified that, in order to reach a conclusion as to whether or not there was a risk that Mr. Almonte might commit suicide in the reasonably near future, she looked for the presence or absence of risk factors. Doctor Kurl affirmed that such risk factors are numerous and can involve demographics; behavioral clues (e.g., the manner of speaking or the posture that a person exhibits); or what she referred to as "something as simple as the look on a person's face." She further testified that, when making an assessment, she tries to look to a number of risk factors and derive an overall opinion as to whether or not the patient presents a risk

of suicide or homicide in the reasonably near future. Doctor Kurl testified as follows about the "items" on the "checklist" that she would have asked Mr. Almonte:

"This is an overall assessment of the patient walking into the room; look at the patient; how he is behaving with you? Is he looking at you? Does he have a flat affect? Is he answering your questions? Are you seeing any gross neurological abnormalities in just talking with him, how he's responding to you? And are there any substances on board? Are there substances on board, and then asking him how he's feeling. Has he been drinking? Yes, he's been drinking and then asking him if he's suicidal. Has he talked about hurting himself? Has he talked about—I don't usually go out and write all these, but I ask them, 'Are you suicidal? Have you thought about hurting yourself? Is life overwhelming for you, and how are you feeling now? Have you ever talked about killing yourself?' "

Doctor Kurl testified that, when she interviewed Mr. Almonte, she did not record any of his answers to her questions because his answers were all negative (and constituted denials of suicidal ideations). Doctor Kurl acknowledged that she never called her patient's wife, Sherry Almonte, to seek further information about Mr. Almonte or about the events of the previous evening.

Doctor Kurl confirmed that, while at the hospital, Mr. Almonte did not have any interaction with a mental health professional. She additionally testified as follows as to the reason that she did not request that any mental health service be called: "I did not find Mr. Almonte to be suicidal; so no, no treatment was provided for that." Doctor Kurl further testified that, in evaluating Mr. Almonte, she did

not "go through" the policy delineated in the Clinical Guidelines and References for patients presenting with altered behavior or mental status because she did not "think [that] he required it." She testified that "[she] made the judgment that [Mr. Almonte] was not at imminent suicide risk and * * * [she] let him go."[18] Doctor Kurl further stated that "[i]f he had been at any imminent risk of suicide, * * * [she] would not have let him go."

During his direct examination of Dr. Kurl, plaintiffs' counsel read part of Dr. Kurl's pretrial deposition testimony into the record. In that testimony, Dr. Kurl stated that, if she had assessed that there was any risk of a suicide attempt by Mr. Almonte, he would not have been discharged from the emergency room; she stated that, instead, "he would have stayed in the emergency room and would have had [a] psychiatric evaluation, and he would have been involuntarily committed *for 72 hours* to the psychiatric facility." (Emphasis added.)

On direct examination by defendants' counsel, Dr. Kurl explained that, when someone in circumstances similar to those of Mr. Almonte comes to the emergency room, she evaluates that person in order to decide whether there is an imminent risk of the person's hurting himself or herself. She added that, if necessary, she then starts the process of involuntary commitment by filling out the forms and calling mental health services. Doctor Kurl added that the rest of the committal process is dependent on the evaluation by the psychiatrist.

### 4. The Evidence as to the Events Which Occurred After Mr. Almonte's Discharge

According to the Fatima Hospital Nursing Notes/ED Order Sheet, Mr. Almonte

**18.** Doctor Kurl qualified her statement that Mr. Almonte "was not at imminent suicide risk" as meaning "any acute risk of suicidal ideation or suicide."

was released from the emergency department to the Cranston Police Department at 2:50 a.m. on September 4, 2000.

The record reflects that, on September 5, 2000, at some time near 6:05 p.m., Mr. Almonte was brought to the Rhode Island Hospital Emergency Department due to a gunshot wound to his head. The wound was thought to have been self-inflicted. Mr. Almonte died at 2:39 a.m. on September 6, 2000 at Rhode Island Hospital as a result of his injuries.

## D

### The Defendants' Motions for Judgment as a Matter of Law

At the close of plaintiffs' case, defendants moved for judgment as a matter of law pursuant to Rule 50. The defendants contended that judgment as a matter of law was warranted because there was "[a] complete absence of any testimony what[so]ever on causation." The defendants further argued that plaintiffs had failed to establish that the commitment procedure (as set forth in § 40.1–5–7) would have kept Mr. Almonte committed through the point in time when in actuality he did commit suicide—namely, thirty-six hours after his discharge from the emergency room.

The trial justice then proceeded to review the relevant statute and noted that, when a mental health facility receives an application (as could have occurred in this case), it has certain obligations under the law that it must fulfill within twenty-four hours. The trial justice also stated that referral to a mental health facility "doesn't mean it's a 72–hour hold." She added that the reference in the statute to seventy-two hours "means that you [have] got to complete that initial examination and evaluation within the 72 hours." Moreover, the trial justice noted that, "[i]f the psychiatrist determines that the patient is not a candidate for emergency certification, he or she shall be discharged."

The plaintiffs' counsel responded to the trial justice's review of the statute by arguing that the instant case has "unique issues that resemble spoliation" because the jury was "left to speculate" as to what the psychiatrist would have done. Additionally, plaintiffs' counsel directed the trial justice's attention to the portion of the deposition transcript of Dr. Kurl that had been read into the record at trial in which she stated that, if she had assessed that there was any risk of a suicide attempt on Mr. Almonte's part, "he would have been involuntarily committed *for 72 hours* to the psychiatric facility." (Emphasis added.)

In rendering her decision on defendant's motion for judgment as a matter of law, the trial justice noted that, regardless of whether or not Dr. Kurl was a competent witness to offer the just-mentioned testimony, no objection had been made thereto. The trial justice additionally noted that Dr. Kurl had dealt with patients who presented similar to Mr. Almonte; had submitted applications for certification; and had dealt with psychiatric workers and facilities. The trial justice proceeded to state that, as a result of that background, Dr. Kurl may have had enough experience to offer the just-mentioned testimony. Accordingly, the trial justice denied defendants' Rule 50 motion.

At the conclusion of their own case, defendants renewed their motion for judgment as a matter of law. Defense counsel reiterated that the instant case completely lacked evidence with respect to causation. The trial justice denied defendants' motion without prejudice to their right to renew it within ten days after a verdict should it be in plaintiffs' favor.

## E

## The Jury Instructions, the Verdict, and the Posttrial Motions

After the attorneys presented their closing arguments, the trial justice proceeded to instruct the jury. In their written requests for instructions that they submitted to the trial justice, plaintiffs had requested a spoliation charge. The plaintiffs contended that such an instruction was necessary because, without it, plaintiffs' "inability to address primarily the issue of causation was impaired by the fact that [Mr. Almonte] never got the psych[iatric] evaluation that he was brought for." [19]

The trial justice denied plaintiffs' request for an instruction on spoliation and added that she "would have liked to have seen one case from any jurisdiction in this entire country that held that spoliation applied in situations such as this." The plaintiffs objected to the trial justice's decision not to give the requested instruction.

Subsequently, the jury deliberated and, in due course, returned with a verdict that Dr. Kurl was not negligent in her treatment of Mr. Almonte.

Thereafter, plaintiffs timely moved for a new trial and for judgment as a matter of law; and, on March 23, 2009, a hearing was held with respect to those motions. On the same occasion, defendants argued in support of their motion seeking reconsideration by the trial justice of her denial without prejudice of their Rule 50 motion.

After considering the arguments with respect to plaintiffs' motion for a new trial and defendants' motion for judgment as a matter of law, the trial justice articulated the appropriate criteria as to each and proceeded to consider "what the jury actually did with their verdict." The trial justice explained that the first question on the verdict form read as follows: "Was the Defendant Dr. Kurl negligent in her treatment of Mr. Almonte?" The trial justice explained that she had instructed the jury that, if it answered "no" to that question, their deliberations were at an end and the jury should not proceed to the other questions. She added that the jury should have reached the second question only if it had found Dr. Kurl to have been negligent. The second question on the verdict form read as follows: "Was the negligence of Dr. Kurl a proximate cause of [Mr.] Almonte's suicide on September 5, 2000?" The trial justice further explained that, despite answering question one in the negative (thereby finding Dr. Kurl not to have been negligent), the jury chose to continue to the second question and also answered that question in the negative. The trial justice concluded, however, that the jury's answering the second question was not "a material inconsistency with [her] instructions." She elaborated that, by answering "no" to both questions, the jury was "in effect rejecting the [plaintiffs'] liability claim."

The trial justice continued her decision on the pending motions by summarizing the testimony as to what information was available to Dr. Kurl on September 4, 2000; she specifically cited the following facts: that Mr. Almonte had said that he had been "playing with guns;" that a family member apparently had been concerned that he would harm himself; that Mr. Almonte had a history of depression and had been treating with Prozac; that he had a history of alcoholism; that he was intoxi-

---

**19.** The plaintiffs' counsel also asserted that he would have liked to conduct cross-examination on the spoliation issue.

cated; that he had been brought by rescue after the police had intervened and taken a firearm away from him; that "there had been a scene at the family home involving that firearm;" and that he had made a telephone call while he was in the emergency room with his mood changing considerably after that telephone call. The trial justice additionally stated that she "was not impressed by the credibility" of Dr. Kurl with respect to her testimony regarding her reasons for not considering Mr. Almonte at imminent risk of harm to himself or others. The trial justice accordingly concluded that, in her view, the jury had misconceived the evidence—because it was her judgment that Dr. Kurl had indeed been negligent in her care of Mr. Almonte.

The trial justice then turned to "Question Number 2" on the verdict form—*viz.*, "Was the negligence of Dr. Kurl a proximate cause of [Mr.] Almonte's suicide on September 5, 2000?" The trial justice stated that the issue of causation "troubled [her] in light of the applicable law and the absence of an opinion by a medical professional, a psychiatrist[,] social worker, [or] any person who was qualified to offer an opinion on proximate cause."

The trial justice proceeded to review the language of § 40.1–5–7 [20] (concerning which statute the trial justice noted that the jury had been instructed). She determined that Dr. Kurl should have applied to a mental health facility for the purpose of having a psychiatrist certify Mr. Almonte on an emergency basis. The trial justice further found that, pursuant to § 40.1–5–7, Dr. Kurl should have requested that a police officer take custody of Mr. Almonte in order to bring him to such mental health facility as she might designate.

The trial justice continued her review of the statute by noting that, once the mental health facility receives an application, it has certain obligations under the law. She explained as follows the requirements of § 40.1–5–7:

> "Following the receipt of the physician's application for certification as soon as possible, but in no event later than 24 hours after reception, a psychiatrist must begin a preliminary examination and evaluation of the person, and the preliminary examination and evaluation shall be completed within 72 hours from its inception by a psychiatrist. It can be completed earlier. * * * It's got to be started at least in 24 hours, no later than 24 hours. It's got to be completed no later than 72 hours. It can be started earlier. It can be completed earlier."

The trial justice then stated that "the record is devoid of any expert opinion that the * * * decedent would not have been discharged within 36 hours after his arrival at a mental health facility."

The trial justice noted the position of plaintiffs—that an expert opinion on "the issue of what would have happened had [Dr. Kurl] filed an application for certification" would have been "unavailable because one can only speculate as to what a psychiatrist would have found." The trial justice disagreed with that position; it was her view that there existed enough information about "the history of [Mr. Almonte], including the fact that he was intoxicated in the emergency room," so that an expert opinion could have been obtained. The trial justice stated that some form of expert opinion could have been presented; she said that such an opinion

---

**20.** *See* Section I A of this opinion, *supra*, where G.L.1956 § 40.1–5–7 is quoted in pertinent part.

could have been based "on information available, made available to the witness, or based on a hypothetical question."

As a result, the trial justice concluded that plaintiffs had not met their burden of proof by a fair preponderance of the evidence with respect to proximate cause. Accordingly, in view of the lack of proof of proximate causation, the trial justice granted defendants' Rule 50 motion. Thereafter, plaintiffs filed a timely notice of appeal.

## II

## Standards of Review

### A

### The Standard Relevant to a Motion for Judgment as a Matter of Law

■ When ruling on a Rule 50 motion for judgment as a matter of law, the trial justice is called upon to consider "the evidence presented at trial in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses * * *." *Swerdlick v. Koch*, 721 A.2d 849, 856 (R.I.1998); *see also Bliss Mine Road Condominium Association v. Nationwide Property and Casualty Insurance Co.*, 11 A.3d 1078, 1083 (R.I.2010); *Mead v. Papa Razzi*, 899 A.2d 437, 442 (R.I.2006) (*Mead II*). A trial justice may grant such a motion if he or she determines that "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue * * *." *Black v. Vaiciulis*, 934 A.2d 216, 219 (R.I.2007) (omission in original); *see also Botelho v. Caster's Inc.*, 970 A.2d 541, 544–45 (R.I.2009); *Marcil v. Kells*, 936 A.2d 208, 212 (R.I.2007). On the other hand, such a motion must be denied "if there are factual issues concerning which reasonable people may reach differing conclusions." *Botelho*, 970 A.2d at 545;

*see also Trainor v. The Standard Times*, 924 A.2d 766, 769 (R.I.2007); *Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005).

■ It is a fundamental principle that this Court reviews in a *de novo* manner a trial justice's decision with respect to a motion for judgment as a matter of law. *See Lett v. Giuliano*, 35 A.3d 870, 874–75 (R.I.2012); *see also Giron v. Bailey*, 985 A.2d 1003, 1007 (R.I.2009). It is also well established that, in conducting that review, we employ the same standard as did the trial justice. *Black*, 934 A.2d at 219; *see also Bliss Mine Road Condominium Association*, 11 A.3d at 1083; *Bajakian v. Erinakes*, 880 A.2d 843, 849 (R.I.2005); *Graff v. Motta*, 695 A.2d 486, 491 (R.I. 1997).

### B

### The Jury Instruction Standard

■ Pursuant to G.L.1956 § 8–2–38, a trial justice is required to "instruct the jury on the law to be applied to the issues raised by the parties." *Malinowski v. United Parcel Service, Inc.*, 792 A.2d 50, 55 (R.I.2002) (internal quotation marks omitted); *see also Gianquitti v. Atwood Medical Associates, Ltd.*, 973 A.2d 580, 594 (R.I.2009). However, it is well established that a jury instruction "must be applicable to the facts that have been adduced in evidence and that a request for instructions is properly denied when there is no basis for such instruction in the evidence." *Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986); *see also Gianquitti*, 973 A.2d at 594; *Morinville v. Old Colony Co–operative Newport National Bank*, 522 A.2d 1218, 1222 (R.I.1987) (stating that, when instructing a jury, the trial justice must frame the issues "in such a way that the instructions reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to

support" (internal quotation marks omitted)).

■ In our review of jury instructions, we will examine them "in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *Lett*, 35 A.3d at 874 (internal quotation marks omitted); *see also Botelho*, 970 A.2d at 545; *Parrella v. Bowling*, 796 A.2d 1091, 1101 (R.I.2002).

## C

### The Standard Relevant to a Motion for a New Trial

■ In passing on a motion for a new trial, the trial justice acts in a role that we have described as being that of "a 'super juror' * * * in that he [or she] makes an independent appraisal of the evidence in the light of his [or her] charge to the jury." *Ruggieri v. Big G Supermarkets, Inc.*, 114 R.I. 211, 215–16, 330 A.2d 810, 812 (1975); *see also Bajakian*, 880 A.2d at 851; *Oliveira v. Jacobson*, 846 A.2d 822, 826 (R.I.2004); *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 770 (R.I.1998). In making his or her appraisal, the trial justice is permitted to "weigh the evidence and assess the witnesses' credibility." *Kurczy*, 713 A.2d at 770 (internal quotation marks omitted); *see also Botelho*, 970 A.2d at 545; *Ruggieri*, 114 R.I. at 215–16, 330 A.2d at 812. Additionally, he or she "can reject some evidence and draw inferences which are reasonable in view of the testimony and evidence in the record." *Kurczy*, 713 A.2d at 770 (internal quotation marks omitted); *see also Yi Gu v. Rhode Island Public Transit Authority*, 38 A.3d 1093, 1099 (R.I. 2012); *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 315 (R.I.2001). If the trial justice "determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions, the trial justice must allow the verdict to stand." *Botelho*, 970 A.2d at 545.

■ This Court will not disturb the decision of the trial justice on a motion for a new trial, unless the plaintiff "can show that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *International Depository, Inc. v. State*, 603 A.2d 1119, 1123 (R.I.1992) (internal quotation marks omitted); *see also Yi Gu*, 38 A.3d at 1099; *Bonn v. Pepin*, 11 A.3d 76, 78 (R.I. 2011); *Bajakian*, 880 A.2d at 852.

## III

### Analysis

### A

### Defendants' Rule 50 Motion for Judgment as a Matter of Law

#### 1. The Proximate Cause Requirement and Expert Testimony

On appeal, plaintiffs contend that the trial justice erred in granting defendants' Rule 50 motion for judgment as a matter of law; they point to the fact that Dr. Kurl had testified during her deposition (which testimony was read into the record at trial) that, if Mr. Almonte had been committed, "he would have been involuntarily committed *for 72 hours* to the psychiatric facility." (Emphasis added.)

■ It is a general rule that, in a wrongful death action, as in any action sounding in negligence, "a plaintiff must establish a standard of care as well as a deviation from that standard." *Malinou v. Miriam Hospital*, 24 A.3d 497, 509 (R.I. 2011) (internal quotation marks omitted); *see also Foley v. St. Joseph Health Services of Rhode Island*, 899 A.2d 1271, 1277 (R.I.2006); *Boccasile v. Cajun Music Limited*, 694 A.2d 686, 689 (R.I.1997). *See*

*generally* 4 Fowler V. Harper et al., *Harper, James and Gray on Torts* § 24.3 at 546 (3d ed. 2007) ("In general, the basis of liability [in wrongful death actions] so far as the defendant's conduct is concerned is the same as that for personal injuries."). In such an action, it is the plaintiff's burden "to establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between the act or omission of the defendant and the injury to the plaintiff." *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 514, 382 A.2d 514, 516–17 (1977); *see also Malinou*, 24 A.3d at 509; *Perry v. Alessi*, 890 A.2d 463, 467 (R.I.2006).

A plaintiff must not only prove that a defendant is the cause-in-fact of an injury, but also must prove that a defendant proximately caused the injury. *State v. Lead Industries Association, Inc.*, 951 A.2d 428, 451 (R.I.2008). Indeed, "[t]he word 'proximate,' in the legal context of 'proximate cause,' requires a factual finding that the harm would not have occurred but for the [act] and that the harm [was a] natural and probable consequence of the [act]." *Pierce v. Providence Retirement Board*, 15 A.3d 957, 964 (R.I.2011) (third alteration in original) (internal quotation marks omitted).

To prove proximate cause, a plaintiff must establish the required causal relationship by competent evidence. *Perry*, 890 A.2d at 467; *see also Mullaney v. Goldman*, 121 R.I. 358, 363, 398 A.2d 1133, 1136 (1979). In most cases, proximate cause may be demonstrated by establishing "that the harm to the plaintiff would not have occurred but for the defendant's negligence." *Schenck*, 119 R.I. at 515, 382 A.2d at 517; *see also Perry*, 890 A.2d at 467.

It is also well established that "expert testimony is required to establish any matter that is not obvious to a lay person and thus lies beyond common knowledge." *Mills v. State Sales, Inc.*, 824 A.2d 461, 468 (R.I.2003); *see also Malinou*, 24 A.3d at 509; *Broadley v. State*, 939 A.2d 1016, 1022 (R.I.2008); *Boccasile*, 694 A.2d at 690 ("[W]here the alleged negligence involves the professional skill and judgment of a nurse, expert testimony must be presented to establish the prevailing standard of care, a breach of that standard, and that the nurse's negligence, if any, was the proximate cause of the patient's injury." (internal quotation marks omitted)).

Moreover, when proximate causation is presented through the testimony of a medical expert, "such evidence must speak in terms of 'probabilities' rather than 'possibilities.'" *Sweet v. Hemingway Transport, Inc.*, 114 R.I. 348, 355, 333 A.2d 411, 415 (1975); *see also Perry*, 890 A.2d at 468. As a result, "[a]lthough absolute certainty is not required, the expert must show that the result most probably came from the cause alleged." *Perry*, 890 A.2d at 468 (internal quotation marks omitted).

In our judgment, expert testimony was required in this case with respect to the issue of proximate cause—because it would not be obvious to a lay person what would most probably have resulted were Mr. Almonte to have been committed pursuant to § 40.1–5–7. *See Perry*, 890 A.2d at 468. We find ourselves to be in agreement with the following perceptive statement by the Supreme Court of New Hampshire concerning the average person's lack of a sufficient preparation to enable him or her to properly assess causal connections relative to suicide:

"Suicide is not easily explained or understood. Its causes, prevention, triggers and warning signs cannot be readily calculated. We conclude that the average person lacks the experi-

ence, training or education about the complexities of suicide to be able to assess whether [particular circumstances] * * * contributed to [an individual's] self-inflicted death or whether the [individual] would have committed suicide even absent the challenged circumstances." *Estate of Joshua T. v. State* [150 N.H. 405], 840 A.2d 768, 772 (N.H. 2003).

The case at bar not only involved the "causes, prevention, triggers and warning signs [of suicide]," *id.*, but it also included testimony concerning a history of depression; alcoholism; threats by the decedent with respect to both himself and his wife; a firearm; and various other statements and actions witnessed by medical personnel. We do not believe that the average lay person would be able to properly assess that complex plethora of evidence without the benefit of expert testimony. *See id.*

Additionally, this case also concerns the various possible consequences of a committal carried out pursuant to § 40.1-5-7—an understanding of which would not be within the common knowledge of a lay person.

For that reason, expert testimony was necessary to inform the fact-finder as to an expert's opinion concerning whether or not Dr. Kurl's failure to commit Mr. Almonte was a proximate cause of his death by suicide.[21]

## 2. Doctor Kurl's Deposition Testimony as to the Commitment Timeline

In the instant case, the only arguable expert testimony with respect to proximate causation was that of Dr. Kurl; that testimony was elicited during her deposition, the transcript of which was read to the jury. It will be recalled that, in that deposition testimony, Dr. Kurl stated that if Mr. Almonte had in fact been committed, "he would have been involuntarily committed for 72 hours" (that length of time being greater than the thirty-six hours which elapsed between the decedent's discharge from the hospital and his suicide). *See* Section I C 3 of this opinion, *supra*. It is plaintiffs' position that the hearing justice was required to accept that testimony as to how long decedent would have remained committed, given the "absence of inherent improbabilities or contradictions" in that

---

21. We pause to note that we are by no means alone in requiring expert testimony in a case of this nature. *See, e.g., Thompson v. Patton*, 6 So.3d 1129, 1141–42, 1142 (Ala.2008) ("The issue of proximate causation in this case was not an issue that could be determined without expert testimony."); *Edwards v. Tardif*, 240 Conn. 610, 692 A.2d 1266, 1269 (1997) (requiring expert testimony in a medical negligence case involving a suicide); *Kanter v. Metropolitan Medical Center*, 384 N.W.2d 914, 916 (Minn.Ct.App.1986) ("In a psychiatric ward the potential tendencies of patients suffering from mental illness are not so easily determined by one without special training and knowledge."); *Estate of Joshua T. v. State*, 150 N.H. 405, 840 A.2d 768, 772 (2003) ("Assessing the causal link between [negligence] and [a child's] death, without the assistance of expert testimony, is simply beyond the capacity of an average juror and would amount to speculation, especially considering

[the decedent's] self-destructive behavior and suicide attempts * * *."); *Wilkins v. Lamoille County Mental Health Services, Inc.*, 179 Vt. 107, 889 A.2d 245, 252 (2005) ("We have repeatedly held that the standard-of-care and causation elements of professional negligence claims [o]rdinarily * * * must be proved by expert testimony, and this is no less true of claims relating to the negligent treatment or assessment of patients at risk of committing suicide." (alteration and omission in original) (citation and internal quotation marks omitted)); *Moats v. Preston County Commission*, 206 W.Va. 8, 521 S.E.2d 180, 188 (1999) (stating that, in the context of a case which "arises from [a community health center's] duties in relation to the involuntary commitment process," determining a deviation from the standard of care "involves more complex issues that are not within the common knowledge of lay jurors").

testimony. As support for their position, plaintiffs point to (1) the trial justice's acceptance of Dr. Kurl's testimony while denying defendants' initial (pre-verdict) Rule 50 motion as contrasted with (2) her failure to mention that testimony when she passed upon the renewed Rule 50 motion.

It is a basic principle that, when a trial justice considers a Rule 50 motion, "[u]ncontradicted testimony may be rejected if it contains inherent improbabilities." *See Franco v. Latina*, 916 A.2d 1251, 1265 (R.I.2007); *see also Flanagan v. Wesselhoeft*, 712 A.2d 365, 370 (R.I.1998) ("[A] judge may grant a defendant's motion for judgment as a matter of law when the plaintiff's evidence, while offering a conflicting set of facts, is so inherently improbable that a jury could not, even in light of the evidence most favorable to the plaintiff, find the defendant had acted negligently."); *Economou v. Valley Gas Co.*, 112 R.I. 514, 521, 312 A.2d 581, 586 (1973); *Gaudette v. Carter*, 100 R.I. 259, 262, 214 A.2d 197, 200 (1965). As a result, a plaintiff may not recover based on "positive evidence that contains inherent improbabilities or contradictions that alone or in connection with other circumstances in evidence destroy the declarant's credibility." *D'Arezzo v. Bowden*, 512 A.2d 843, 846–47 (R.I.1986); *see also Menard & Co. Masonry Building Contractors v. Marshall Building Systems Inc.*, 539 A.2d 523, 525 (R.I.1988).

In the case at bar, plaintiffs' contention that Dr. Kurl's deposition testimony was uncontradicted and therefore should be determinative fails to take into account the plain and unambiguous language of the emergency certification statute, § 40.1–5–7. The emergency certification statute provides that, within one hour after reception at a mental health facility, the patient shall be seen by a physician. *See* § 40.1–5–7(c) (quoted *in extenso* in Section I A of this opinion, *supra*). The statute then goes on to provide that, "[a]s soon as possible, but in no event later than twenty-four (24) hours after reception, a preliminary examination and evaluation of the person by a psychiatrist or a physician under his or her supervision shall begin." *Id.* (emphasis added). The statute further expressly provides that examination and evaluation "shall be completed *within* seventy-two (72) hours from its inception by the psychiatrist." *Id.* (emphasis added). Section 40.1–5–7(c) further provides that, "[i]f at *any time* the official in charge of a facility or his or her designee determines that the person is not in need of immediate care and treatment, * * * he or she shall *immediately* discharge the person." (Emphasis added.)

We are in full agreement with the trial justice's cogent paraphrasing of the terms of the statute at issue. (*See* Section I E, *supra*.) Significantly, the preliminary examination and evaluation of the patient must begin at any point in time prior to the expiration of twenty-four hours after the patient has been received by the mental health service; and the official in charge of the facility must immediately discharge a person if the official finds that he or she is not in need of immediate care. *See* § 40. 1–5–7(c). In view of the *plain meaning* of the cited statutory provisions, it is clear that Mr. Almonte could have been discharged at some point in time within the first twenty-four hours of his commitment. Similarly, it would have been required that the preliminary examination and evaluation be completed at some point within seventy-two hours from its inception by the psychiatrist. *See id.* Contrary to what Dr. Kurl indicated in her deposition, that section does not mean that a patient must necessarily remain committed for the full seventy-two-hour period that is referenced in the statute; rather,

the physician must complete his or her examination and evaluation at some point in time before seventy-two hours have elapsed from the inception of the examination and evaluation. *See id.* Accordingly, it is entirely possible that a patient could be discharged prior to the expiration of that seventy-two-hour period if the official in charge were to find that person not to be in need of immediate care and treatment.

In light of the plain language of § 40.1–5–7, it is not at all clear that Mr. Almonte would have been committed for a full seventy-two hours as Dr. Kurl testified, nor is it clear that he would have been committed at all; all that would. have been required was that his preliminary examination and evaluation be completed before that period of time elapsed. Accordingly, it is our view that, given the clarity of the statutory language, the testimony of Dr. Kurl to the effect that Mr. Almonte "would have been involuntarily committed for 72 hours" contained inherent improbabilities which, in the language of the pertinent case, "destroy[ed] the declarant's credibility" as to that specific issue. *See D'Arezzo,* 512 A.2d at 846–47. In her decision granting defendants' renewed Rule 50 motion, the trial justice, although not explicitly discussing Dr. Kurl's testimony, stated that the statute's practical application and language were contradictory to plaintiffs' position (*i.e.,* that Mr. Almonte would have been confined for over thirty-six hours if he had been committed). Due to the fact that the portion of Dr. Kurl's deposition testimony relied upon by plaintiffs contained inherent improbabilities, the trial justice committed no error in not giving that testimony any weight in assessing defendants' motion for judgment as a matter of a law.

### 3. The Plaintiffs' Further Contentions About Causation

The plaintiffs opted not to present any further witnesses who might have tes-tified concerning the issue of causation or the procedure that would have been followed pursuant to § 40.1–5–7 had Mr. Almonte been committed. Indeed, plaintiffs have expressly acknowledged in their brief to this Court that "Dr. Kurl's admission remains the *best* and *only* evidence in the case." (Emphasis in original.)

Although plaintiffs have taken the position that expert testimony would have been futile, the trial justice concluded, as do we, that the complete lack of evidence as to causation warranted her grant of defendants' motion for judgment as a matter of law; that conclusion was predicated on the fact that, even viewing the evidence in the light most favorable to plaintiffs, no evidence existed with respect to proximate causation concerning which reasonable minds could differ.

In order to meet their burden with respect to the issue of causation, it was necessary for plaintiffs to have presented an expert to show that it was a probability, not a mere possibility, that the negligence of Dr. Kurl caused Mr. Almonte's death. *See Perry,* 890 A.2d at 468. A venerable and frequently cited treatise on the law of torts has summarized the operative principle as follows:

"A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, * * * it becomes the duty of the court to direct a verdict for the defendant." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 41 at 269 (5th ed.1984) (footnotes omitted).

Rather than presenting such evidence, the sole evidence in support of plaintiffs' case with respect to causation (*viz.,* Dr. Kurl's deposition testimony) was contradicted and rendered inherently improbable by the plain language of the emergency certifica-

tion statute; as a result, Dr. Kurl's testimony did not constitute legally sufficient evidence with respect to causation to render it sufficient to be submitted to a jury. Accordingly, after a thorough review of (1) the record of what transpired at trial; (2) the deposition testimony of Dr. Kurl; and (3) the language of § 40.1-5-7, we are convinced that the trial justice did not err in granting judgment as a matter of law for defendants.

## B

### Jury Instructions Regarding Spoliation

The plaintiffs further contend that the trial justice erred in her decision not to instruct the jury on spoliation. The plaintiffs base that argument on their contention that, in a case such as this, if "a gap in the evidence" exists, the burden of "filling" such a gap should be borne by defendants. The plaintiffs argue that, in this type of case, when a defendant is found to have been negligent, a spoliation instruction should be given. At oral argument, plaintiffs' counsel candidly described as "metaphysical" the theory of spoliation for which he was advocating in this case; he undoubtedly employed that adjective in view of the fact that the written evaluation that would have been the subject of the requested spoliation instruction never in fact existed.

■■■ Pursuant to the doctrine of spoliation, "the deliberate or negligent destruction of relevant evidence by a party to litigation may give rise to an inference that the destroyed evidence was unfavorable to that party." *Tancrelle v. Friendly Ice Cream Corp.,* 756 A.2d 744, 748 (R.I.2000); *see also Mead v. Papa Razzi Restaurant,* 840 A.2d 1103, 1108 (R.I.2004) (*Mead I* ); *Rhode Island Hospital Trust National Bank v. Eastern General Contractors, Inc.,* 674 A.2d 1227, 1234 (R.I.1996).

■■■ Underlying the spoliation doctrine is our policy-based resolve to "decline to allow defendant[s] to benefit from [their] own unexplained failure to preserve and produce responsive and relevant information during discovery." *Mead I,* 840 A.2d at 1108 (alterations in original) (internal quotation marks omitted); *see also Nation-Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir.1982); Jamie S. Gorelick et al., *Destruction of Evidence* § 2.2 at 33 (Aspen 1989) (discussing the functions of the spoliation doctrine).

Quite recently, in *Mead II,* 899 A.2d at 442–43, this Court stated that the spoliation doctrine includes the failure "to produce a document which the evidence tended to show was routinely generated by the corporation."

■■■ In the instant case, plaintiffs, in essence, urge this Court to further expand the holding of *Mead II* and the policies underlying the doctrine of spoliation by holding that that doctrine applies to circumstances such as those presented by this case—where the negligence of a defendant caused a particular event (*viz.,* commitment) never to have occurred and, therefore, certain evidence (*viz.,* an evaluation) never to have come into existence. We are unwilling to stretch the spoliation doctrine to those bounds.

In our view, the absence of an evaluation of Mr. Almonte by a mental health service reflects *negligent care* on the part of Dr. Kurl, *not* the spoliation of evidence. In *Mead II,* there was evidence that the incident report at issue would have been routinely generated by the corporation under the circumstances in that case. *See Mead II,* 899 A.2d at 442–43 (stating that this Court has held that a spoliation instruction is appropriate when a corporate defendant has "failed to produce a document *which the evidence tended to show was routinely*

*generated* by the corporation and * * * was unable to provide a satisfactory explanation as to why the document was not prepared with respect to the incident in the case before the court" (emphasis added)). We are not confronted in this case with a situation similar to that which was presented in *Mead II*.

Extending the spoliation doctrine to the case before us would not further the underlying purpose of that doctrine—*viz.*, to prevent parties from benefiting from their own unexplained failure to produce certain evidence. *See Mead I*, 840 A.2d at 1108. Moreover, in the context of the instant case, it cannot be said that Dr. Kurl was more likely "to have been threatened by the document" (because the document did not exist) and therefore must be subject to the doctrine's "prophylactic and punitive effects." *See Nation–Wide Check Corp., Inc.*, 692 F.2d at 218. In light of the foregoing policies and the "metaphysical" nature of the never-performed evaluation, we decline to apply the spoliation doctrine to the evaluation which never had the opportunity to be produced (albeit as a result of Dr. Kurl's negligence).

Accordingly, the trial justice did not err in declining to give a jury instruction on the spoliation doctrine.

### C

### Evidentiary Presumption Pursuant to § 40.1–5–7

The plaintiffs further argue that the trial justice erred by not recognizing that they are entitled to an evidentiary presumption based upon the policy that they contend underlies § 40.1–5–7. The plaintiffs base that argument on their observation that a mental health facility was not permitted "to actually form [an] opinion [as to what it would have done with a patient under the emergency certification

statute] because by statute a fresh evaluation had to be performed as a condition precedent to forming that opinion." (Emphasis omitted.) As a result, according to plaintiffs, unfairness resulted when "[Mr. Almonte]'s survivors were held liable for failure to meet an evidentiary burden on a matter as to which Dr. Kurl herself ought to have been responsible."

### 1. The *Summers v. Tice* Standard

■ The plaintiffs urge this Court to adopt the alternative liability theory articulated by the California Supreme Court in the case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), in the instant "situation." (By their use of the term "situation," we understand plaintiffs to be referring to an instance where a doctor has been found to have been negligent and § 40.1–5–7 is involved.)

In *Summers*, 199 P.2d at 1–2, the plaintiff brought a lawsuit against two hunters in connection with an injury that the plaintiff had sustained to his right eye and face; that injury was the result of the plaintiff having been "struck by bird shot discharged from a shotgun." There was evidence in that case that, either simultaneously or one immediately after the other, the two defendants shot at a bird, but also in the direction of the plaintiff, who was situated uphill from the location of the defendants (and of whose location the defendants were aware). *Id.* at 2. In light of those facts, the trial court was unable to ascertain from whose gun the shots that caused the plaintiff's injuries were fired. *Id.* at 3.

The California Supreme Court in *Summers*, 199 P.2d at 4, explained that both of the defendants were negligent vis-a-vis the plaintiff. The court then held that, in considering "the relative position of the parties and the results that would flow if [the] plaintiff was required to pin the inju-

ry on one of the defendants only," the burden of proof with respect to who caused the injury should be shifted to the defendants. *Id.*

At first glance, the policy underlying the alternative liability doctrine set forth in *Summers*—*viz.*, to have the negligent defendants, rather than the innocent plaintiff, bear the burden of proving which defendant caused the injury and resultant damages—might seem to serve the interests of justice in the instant case. However, after carefully considering the particular problem and the policy addressed in that case, we decline to extend that policy to this wrongful death case, which involves allegations of medical malpractice.

In *Summers,* there was no question as to the fact that one of the two hunters caused the injury; instead, the problem presented was a lack of proof as to *which* of the two defendants caused the injury, not *whether* one of the defendants caused the injury. *See Summers,* 199 P.2d at 4. The California Supreme Court in *Summers* opted, as a matter of policy, to shift the burden of proof as to causation to the defendants when it was absolutely clear that the injury was, in fact, caused by one of the negligent defendants. *See* W. Page Keeton et al., § 41 at 271. The just-cited respected treatise on the law of torts has commented favorably on the *Summers* decision as follows:

> "It seems a very desirable solution where negligence on the part of both defendants is clear, and it is only the issue of causation which is in doubt, so that the choice must be made between letting the loss due to failure of proof fall upon the innocent plaintiff or the culpable defendants." *Id.*

In contrast, in the instant case, although the trial justice found that Dr. Kurl was negligent, the trial justice was not presented with evidence that made it plainly evident that that negligence indeed *caused* Mr. Almonte's death. *See id.* ("But where there is *no evidence even as to where culpability lies,* the hardship may be equally great upon an innocent defendant; and except in very special cases the courts *have refused to shift the burden of proof.*" (emphasis added) (footnote omitted)). As a result, we decline to extend to the present case the policies underlying the alternative liability theory in *Summers.*

### 2. The Loss of Chance Doctrine

■ In their brief to this Court, plaintiffs concede that the loss of chance doctrine "is not dispositive" with respect to this case; they contend, however, that that doctrine and the policies that underlie it are "enlightening to show the willingness of courts to respond to proof problems imposed upon innocent plaintiffs by negligent defendants."

We preliminarily note that we have previously made mention of the loss of chance doctrine, which has been recognized by some jurisdictions, but we have not engrafted the doctrine upon the body of our tort law. *See, e.g., Malinou,* 24 A.3d at 512 n. 16; *Foley,* 899 A.2d at 1281; *Contois v. Town of West Warwick,* 865 A.2d 1019, 1023–27 (R.I.2004). We have indicated that, although we have not deemed the facts in previous cases to be appropriate for the application of the loss of chance doctrine, we may at some future time revisit the doctrine "under an appropriate factual scenario." *Contois,* 865 A.2d at 1025.

The loss of chance doctrine represents an approach to the issue of causation that is more liberal and expansive than what is reflected in traditional tort liability theories. *Contois,* 865 A.2d at 1023; *see also Malinou,* 24 A.3d at 512; *Mandros v. Prescod,* 948 A.2d 304, 310 (R.I.2008).

Pursuant to the loss of chance doctrine, "[l]oss of chance occurs when the defendant's negligent conduct caused the plaintiff to lose a chance to avoid the ultimate harm." *Contois*, 865 A.2d at 1023 (internal quotation marks omitted); *see also Malinou*, 24 A.3d at 512; *Mandros*, 948 A.2d at 310.

Although the loss of chance doctrine is more expansive than traditional tort liability theories, it nevertheless "remains necessary for a plaintiff alleging loss of chance to first establish a duty and breach of that duty." *Contois*, 865 A.2d at 1023; *see also Malinou*, 24 A.3d at 512. Then, instead of proving that the breach of duty proximately caused the alleged harm, a plaintiff in a loss of chance case "need only establish that defendant's negligence was a proximate cause of the lost chance to avoid the ultimate harm." *Contois*, 865 A.2d at 1023 (internal quotation marks omitted). However, in order to succeed under that more expansive theory of causation, a plaintiff must still "present *evidence* that the alleged negligence was a proximate cause of the loss of chance." *Foley*, 899 A.2d at 1281 (emphasis added); *see also Malinou*, 24 A.3d at 512.

In the instant case, plaintiffs did not present any competent evidence as to causation. (*See* Section III A of this opinion, *supra*.) Although, as plaintiffs point out, some courts have been willing to respond to proof problems imposed upon plaintiffs by negligent defendants by adopting the loss of chance doctrine, even those courts nevertheless still require some meaningful proof of causation of that loss of a chance. *See Foley*, 899 A.2d at 1281; *see also Matsuyama v. Birnbaum*, 452 Mass. 1, 890 N.E.2d 819, 832, 833 (2008) ("In order to prove loss of chance, a plaintiff must prove by a preponderance of the evidence that the physician's negligence caused the plaintiffs likelihood of achieving a more

favorable outcome to be diminished. * * * The loss of chance doctrine, so delineated, makes no amendment or exception to the burdens of proof applicable in all negligence claims."). In this case, plaintiffs could have presented an expert to testify as to the process that would have taken place after a committal pursuant to § 40.1–5–7; the inexorable reality is that plaintiffs, however, chose not to present any such witness. Accordingly, even if the policies underlying the loss of chance doctrine were to be held applicable to the instant case, plaintiffs simply did not present any evidence as to causation.

### 3. The Policy Underlying the Emergency Certification Statute

The plaintiffs further contend that the public policy underlying the emergency certification statute, § 40.1–5–7, "screams at us from [its] plain text." The plaintiffs specifically contend that "logic and rationality, as well as fairness" justify their contention that "the obligation to produce evidence on a problematic issue [should] be allocated in the first instance to the party whose wrongful conduct caused the problem."

 We begin by noting that the sections of the emergency certification statute which provide for the initiation of certification proceedings are discretionary rather than mandatory. *See Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 661 (R.I.2009) ("[T]he sections of the Mental Health Law providing for the initiation of certification proceedings are discretionary; they are not mandatory."); *see also* § 40.1–5–7(a) (stating that "[a]ny physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an

imminent likelihood of serious harm by reason of mental disability, *may* apply at a facility for the emergency certification of the person thereto" (emphasis added)). Despite plaintiffs' contentions, we are mindful that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see also Jones v. United States*, 463 U.S. 354, 361, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983). Accordingly, in order to confine an individual, the state must have "a constitutionally adequate purpose." *O'Connor v. Donaldson*, 422 U.S. 563, 574, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *see also Jones*, 463 U.S. at 361, 103 S.Ct. 3043. In light of those constitutional requirements, it is evident that the "Rhode Island Mental Health Law was carefully crafted in order to guarantee that the liberty of an individual patient would be scrupulously protected and that this liberty would be impaired only in the event of findings of stringent necessity by proof beyond a reasonable doubt in the case of an initial certification * * *." *In re Doe*, 440 A.2d 712, 714 (R.I.1982); *see also Santana*, 969 A.2d at 667.[22]

In view of those underlying policies and the clear mandate of § 40.1–5–7, we are of the opinion that the statutory language reflects, through its explicit requirements as to the time within which certain steps must be taken, the General Assembly's careful balancing of the constitutional rights of individual patients and the state's interest in committing patients should it be necessary. We decline to tip that legislatively crafted balance reflected in that statutory provision by attaching an evidentiary presumption. *See generally* Phyllis Coleman & Ronald A. Shellow, *Suicide: Unpredictable and Unavoidable—Proposed Guidelines Provide Rational Test for Physician's Liability*, 71 Neb. L.Rev. 643, 646 (1992) ("[T]he spectre of legal liability for a patient's suicide may, consciously or unconsciously, influence a physician's decision, inappropriately clouding what should be solely a medical decision." (footnote omitted)).[23]

We recognize, as plaintiffs have emphasized, that the instant case and others involving suicide may involve inherent difficulties in proving the traditional required element of causation in negligence cases and that, therefore, there may be potentially "harsh outcomes that * * * result." *See Wilkins v. Lamoille County Mental Health Services, Inc.*, 179 Vt. 107, 889 A.2d 245, 249 (2005). As described by the Supreme Court of Vermont, those difficulties "may, indeed, be uniquely complex and challenging in cases involving suicide, where even under accepted standards of care predictions of suicide are notoriously difficult and compounded by the fact that the patient, unlike other malpractice situations, may be actively working at cross-purposes to the practitioner's goals." *Id.; see also Champagne v. United States*, 513 N.W.2d 75, 78 (N.D.1994). *See generally* Coleman & Shellow, 71 Neb. L.Rev. at 644

---

**22.** We are aware that, in the context of a certification, "to the extent practicable, the person must be cared for in a facility that imposes the least restraint upon his or her liberty, consistent with affording the care and treatment necessary and appropriate to his or her condition." *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 662–63 (R.I.2009).

**23.** We pause to note that the determination that the physician makes with respect to whether a patient will commit suicide within a short period of time "ha[s] obvious important consequences for the patient." *See* Phyllis Coleman & Ronald A. Shellow, *Suicide: Unpredictable and Unavoidable—Proposed Guidelines Provide Rational Test for Physician's Liability*, 71 Neb. L.Rev. 643, 656 (1992).

("[T]he physician's dilemma: the difficulty of predicting the suicide of any one individual makes it almost impossible to decide how much intervention is necessary to achieve the twin goals of treating a patient's underlying illness and saving his life. Nevertheless, under the current system the physician is exposed to legal liability for failing to do just that.").

That being said, it is nonetheless our view that the traditional negligence causation standard does not "represent an insurmountable barrier to recovery in malpractice claims involving suicide."[24] *See Wilkins*, 889 A.2d at 250. In our judgment, there exist means by which a plaintiff could prove causation (that a patient would have been committed) pursuant to the traditional standard of causation.[25] Additionally, from our review of the exhibits presented by plaintiffs, there seem to be a number of medical records which an expert could rely on in formulating an opinion as to the factors that may have indicated a risk of suicide.

■ In light of the policy that underlies § 40.1–5–7 and the significance of our traditional burden of proof as to causation, we decline to create an evidentiary presumption with respect to causation in suicide cases. Rather, we hold that, in such a case, the plaintiff still bears the burden of proof to establish that the breach of a physician's duty proximately caused the patient's suicide. *See Edwards v. Tardif*, 240 Conn. 610, 692 A.2d 1266, 1270 (1997) (holding that "a physician may be liable for a patient's suicide when the physician knew or reasonably should have known of the risk of suicide and the physician's failure to render adequate care and treatment proximately causes the patient's suicide"); *see also Patton v. Thompson*, 958 So.2d 303, 312 (Ala.2006) ("[T]he plaintiff in any

24. We note that, despite the existence of the complexities in proof of causation, the prediction of suicide is an area of the law that has been the focus of considerable research. *See, e.g.*, Gregory K. Brown et al., *Risk Factors for Suicide in Psychiatric Outpatients: A 20-Year Prospective Study*, 68 Journal of Consulting and Clinical Psychology 371 (2000); Michael F. Grunebaum et al., *Antidepressants and Suicide Risk in the United States, 1985–1999*, 65 Journal of Clinical Psychiatry 1456 (2004); K. Hawton, *Assessment of Suicide Risk*, 150 Brit. J. Psychiatry 145 (1987). To satisfy the traditional causation standard, a plaintiff's expert witness may rely on diagnoses such as drug and alcohol abuse; depression; panic disorder; schizophrenic disorders; and personality disorders, "especially borderline personality disorder or antisocial personality disorder." *See* Coleman & Shellow, 71 Neb. L.Rev. at 650, 651. In addition to those diagnoses, a plaintiff's expert may also consider other factors—*e.g.*, a history of suicide attempts; hopelessness; a history of a suicide attempt in the family; access of means to commit suicide; and formulation of a definite plan. *See id.* at 652–54. We note that the just-listed diagnoses and factors are neither exhaustive nor universally applicable; we merely wish to demonstrate that plaintiffs do, in fact, have methods of proving the probability that a patient would or would not have been judged to have been at risk of committing suicide.

25. It should be noted that, despite complexities in proving causation under the traditional negligence standard, plaintiffs in various jurisdictions have nevertheless succeeded in establishing evidence of causation under such a standard in a case involving the eventual suicide of a physician's patient. *See Wilkins*, 889 A.2d at 250; *see, e.g.*, *Bell v. New York City Health & Hospitals Corp.*, 90 A.D.2d 270, 456 N.Y.S.2d 787, 796 (1982) (stating that the plaintiffs' proof on the question of causation was sufficient for the case to be submitted to the jury when the "[p]laintiffs' expert testified that the premature discharge of the patient was a contributing factor in the attempted suicide, which was viewed as being part of a continuing psychotic process"); *Husted v. Echols*, 919 S.W.2d 43, 45 (Tenn.Ct.App. 1995) (holding that it was error to direct a verdict for the defendant where an expert testified that the defendant's "failure to adequately evaluate and treat [the decedent] was a direct proximal cause of his death by suicide").

medical-malpractice action, including medical-malpractice/wrongful-death actions against a psychiatrist resulting from the suicide of that psychiatrist's patient, must prove by substantial evidence that the psychiatrist breached the applicable standard of care and that that breach was a proximate cause of the patient's injuries."); *Peterson v. Reeves*, 2012 WL 1072202, at *4 (Ga.Ct.App. Mar. 30, 2012) (stating that a psychiatrist "can be held liable if his treatment of [his patient] fell below the requisite standard of care, and this failure proximately caused [that patient's] injury"); *Hoeffner v. The Citadel*, 311 S.C. 361, 429 S.E.2d 190, 194 (1993) (stating that "health care professionals are subject to liability for failure to prevent suicide only when departure from the standards of their profession proximately causes their patient's suicide" and not imposing strict liability on those with a duty to prevent suicide).

Since the record contains no evidence of causation (*see* Section III A, *supra*), we affirm the ruling of the trial justice with respect to defendants' motion for judgment as a matter of law.[26]

### D

### The Plaintiffs' Rule 59 Motion for a New Trial

In light of our determination that there was no evidence upon which a reasonable jury could base a finding of proximate causation (*see* Section III A, *supra*) and our rejection of the plaintiffs' arguments concerning a spoliation instruction and concerning an evidentiary presumption, we are unable to perceive any basis for ruling that the plaintiffs are entitled to a new trial.

26. We need not reach plaintiffs' contention with respect to the presumption that is applied in bailment cases—because, in our judgment, the venerable requirement that a plaintiff in a negligence case bear the burden of proving proximate causation represents sound policy.

### IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.